IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY MITCHELL, SR., et al. | No. C 09-00794 SI |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| CITY OF PITTSBURG, et al., | |
| Defendants. | |

On January 14, 2011, the Court heard argument on two motions for summary judgment, one filed by defendant Norm Wielsch, and one filed by the remaining defendants.[1] Having considered the arguments of counsel and the papers submitted, the Court hereby GRANTS both motions.

**BACKGROUND**

This suit arises out of the shooting death of decedent Timothy Mitchell, Jr. by defendant police officer Lester Galer on March 11, 2008. Defendant Les Galer was a police officer employed by the City of Pittsburg, and was a member of the Contra Costa County Narcotics Enforcement Team ("CCCNET"). The shooting occurred while several officers, including all of the remaining defendants in this case, were attempting to execute a search warrant at Mr. Mitchell's apartment.

---

[1] Former defendants City of Pittsburg, chief Aaron Baker, City of Walnut Creek, Joel Bryden, City of San Ramon, and Scott Holder, were all dismissed from the suit previously. *See* Doc. 70. At the hearing, the Court inquired as to the status of Central Contral Costa Narcotic Enforcement Team ("CCCNET"), which was named as a defendant in the complaint. The parties agreed that the case has not been prosecuted against CCCNET.

## I.     The claims

The plaintiffs in this case are Timothy Mitchell, Sr. and Paulette Mitchell, the parents of Timothy Mitchell, Jr. The remaining defendants are five police officers: Les Galer and his identical twin brother Phil Galer, Sean Dexter, Louis Lombardi, and Norm Wielsch. The operative complaint is the Third Amended Complaint ("TAC"), which states five causes of action. *See* doc. 58 (TAC). Plaintiffs first bring a Fourth Amendment claim under 42 U.S.C. § 1983 against all defendants, for violation of Timothy Mitchell, Jr.'s civil rights, because the manner in which each "attempted to execute the search warrant was unreasonable and created a grave and unnecessary danger to Decedent and proximately caused Decedent's death." TAC ¶¶ 41–42. Second, they bring a Fourteenth Amendment claim, also under section 1983 and against all defendants, for violation of the parents' "right to enjoy family relations with their son and to enjoy his companionship and society." *Id.* ¶¶ 43–44. Third, they bring a failure to train claim under section 1983 against defendant Wielsch, who allegedly "did not train with any regularity and . . . did not address how to respond when a forced entry was compromised and what an officer should do if the officer in front of him suddenly stops while entering a residence." *Id.* ¶¶ 50–52. Fourth, they bring a failure to supervise claim, also under section 1983 and against defendant Wielsch, who was allegedly "deliberately indifferent to [his] duty to supervise the operation and thereby proximately caused the death of Decedent." *Id.* ¶¶ 53–55. Finally, they bring a state law wrongful death claim under California Code of Civil Procedure ("CCCP") § 377.60 against all defendants except Wielsch.

## II.     Evidence regarding the investigation

The parties generally agree about what happened up to the point where the police began to knock and announce their presence to Mr. Mitchell. Defendant Dexter was the case agent or lead investigator for the search warrant. Dexter Decl. ¶ 8. A confidential informant told defendant Dexter that an African-American man named Tim was selling marijuana out of 1017 H Street, Apartment 19, in Antioch, California. *Id.* ¶ 9. Timothy Mitchell, Jr. lived in that apartment. *Id.* ¶ 11. The confidential informant identified Mr. Mitchell's photograph. *Id.* ¶ 12. Defendant Dexter found two criminal records associated with Mr. Mitchell's name and birth date, one of which included an adult felony conviction

for robbery, as well as a number of arrests for drug-related Health and Safety Code crimes. *Id.* ¶ 13; *Id.* Ex. A at WN21. (It turns out that the criminal record that included the adult felony conviction belonged to a different individual.[2]) Defendant Dexter secured a warrant to search Mr. Mitchell's apartment and Mr. Mitchell. *Id.* Ex. A at WN13–WN15. At some point, the confidential informant told defendant Dexter that Mr. Mitchell kept a sawed off shotgun by the front door, although this detail is not included on the search warrant application. *Id.* ¶ 9 & Ex. A.

Mr. Mitchell's apartment is located on the second floor of a two-story U-shaped complex. Marzan Decl. Ex. A, 66:19–66:20. There is a "cat walk" that goes around in front of the apartments on the second floor that is approximately three feet wide. *Id.* Ex. C, 30:9–30:10. The front door to the apartment has a metal "security door" in front of it with bars arranged in a "star burst" pattern made up primarily of diagonally placed beams. *See* Lombardi Decl. Ex. A (photographs). The security door opens out onto the catwalk, with hinges on the right hand side. *See id.* The interior wooden door opens into the apartment, with hinges on the same side. *See id.* Immediately to the left of the door are a fire extinguisher and what appears to be an air conditioning unit; several feet to the left and right of the doors are two large windows. *See id.*

Defendant Wielsch is the CCCNET task force commander, and he oversaw the operation in this case. Wielsch Decl. ¶¶ 3, 11. With the help of defendant Les Galer, defendant Dexter formed a plan to execute the search warrant that involved a "tactical entry" (which the parties explain means forcible entry into a residence where people are present, in this case Mr. Mitchell, Pl. Opp. at 4). Defendant Wielsch explained that CCCNET rejected any plan that would involve waiting for Mr. Mitchell to exit the building, as defendant Dexter had been informed that Mr. Mitchell would often remain in the apartment for days on end, and the apartment complex was not arranged in such a way that the members of CCCNET would be able to conduct surveillance of his apartment for a long period without being noticed. Additionally, CCCNET rejected any plan to lure Mr. Mitchell out of his apartment with a controlled buy, as they had been told that Mr. Mitchell sold marijuana from inside his apartment.

---

[2] Defendant Dexter disclosed on the warrant application that he had found two different criminal records that appeared to belong to the same Timothy Mitchell, Jr. Marzan Decl. Ex. D, 16:18–16:19. Although it struck him as odd or peculiar, he did not look into the issue because it was not "germane" to his investigation. Yourke Decl. Ex. 1, 15:23–16:1, 20:10–20:17.

3

Marzan Decl. Ex. A, 66:13–68:15.

The team decided to execute the warrant at approximately seven in the morning, when "[t]here was a higher probability that [Mr. Mitchell] would not be sitting in the living room armed with his shotgun." Dexter Decl. ¶ 15. Although the decision was influenced in part by the police officers' belief that Mr. Mitchell had an adult felony conviction, defendant Wielsch "still would have approved the operation" if he had known this not to be true. Marzan Decl. Ex. A, 22:1.

Around seven on the morning of March 11, defendant Dexter crossed in front of and stood to the right of Mr. Mitchell's door, where he knocked and announced that the police were present with a search warrant. Dexter Decl. ¶¶ 18–21. Defendant Lombardi stood to defendant Dexter's left with a "rake" or "pick," which he brought in order to force open the metal security door if necessary. Defendant Les Galer kneeled to defendant Lombardi's left with a "key" or "ram," which he brought in order to force open the interior wooden door if necessary. *Id.* Five other officers, including defendant Phil Galer and defendant Wielsch, remained approximately six feet to the left of the door until the doors were opened, in order not to be seen through the window. Wielsch Decl. ¶ 19; Marzan Decl. Ex B, 52:22–53:3. Of that group, defendant Phil Galer stood closest to the door. Marzan Decl., Ex. D, 26:17–26:18.

### III. Evidence regarding the execution of the warrant

The parties agree as to the approximate sequence of events that occurred when defendants executed the search warrant. Defendant Lombardi began to use the rake on the security door. Approximately one minute after defendant Dexter first knocked and announced the police presence, the security door opened. The interior wooden door was open several inches. Defendant Les Galer dropped the key, pushed open the door, and started to walk into the apartment. He shot and killed Mr. Mitchell. Inside the apartment, the police officers found marijuana, evidence of marijuana sales such as a digital scale and a box containing plastic sandwich bags, and, in the bedroom, a loaded sawed-off shotgun. Dexter Decl. Ex. A at WN26.

The disagreement in this case is over what exactly happened between the time that defendant Dexter knocked to announce the police presence and the time that defendant Les Galer killed Mr.

4

1 Mitchell. To prove what happened, defendants rely primarily on statements they made at a coroner's
2 inquest, in depositions, and in declarations attached to these motions. In opposition, plaintiffs rely
3 primarily on the declaration of Roger Clark, their expert on police procedure, as well as some of the
4 testimony by defendant Lombardi at the coroner's inquest.

### A. The doors

At the coroner's inquest, defendant Lombardi stated that he began to use the rake after defendant Dexter knocked and announced the police presence and request for entry for the second time, that the rake made an incredible amount of noise, and that all he could hear while using the rake was defendant Dexter yelling "'Come to the door. Come to the door.'" Marzan Decl., Ex. C, 70:3–71:16. In a later declaration, defendant Lombardi states that he also heard "A male voice coming from inside the apartment" that "stated, 'Hang on.'" Defendant Dexter continued to yell "'Police Department. Search warrant. Come to the door.'" And then, "after some delay, the person inside stated 'You got the wrong place.'" At that point, defendant Dexter told him to "Rip the door," and he attempted to do so. Lombardi Decl. ¶¶ 6–7.

At the coroner's inquest, defendant Les Galer stated that defendant Dexter said something to the effect of "Go to your door and open it" several times, in a manner that sounded like he was conversing with a person rather than commanding him. Marzan Decl., Ex. C, 34:20–34:7. At that point, defendant Les Galer could not hear anything that was happening inside of the apartment until he heard a voice state "you have the wrong house." *Id.* 34:25–35:1; 36:6–36:7. In a later declaration, defendant Les Galer clarifies that it was after the dialogue between defendant Dexter and the occupant (he "could not hear the occupant's initial response") that defendant Dexter "gave the command to Det. Lombardi to pull open the metal security door with the snatch. At about that time, I heard a male voice inside the apartment yelling, 'You have the wrong house,' two or three times." L. Galer Decl. ¶¶ 21–22.

Defendant Dexter states in a declaration that he repeated his knock and announce, after which he heard "a male voice from inside the apartment state[], 'Hang on.'" Dexter Decl. ¶ 22. He continued to pound and shout, and "after some delay, the person inside in the same male voice stated, 'You got the wrong place.'" *Id.* He "then heard another officer on the other side of the doorway state, 'Come

5

to the door. It's the police. Come to the door.' When the resident did not open the door in response to my commands, I told Lombardi to open the door with the pick." *Id.* ¶ 23.

Defendant Lombardi is certain that he is the one who forced the security door open, and that he could see a rip and a bend in the door consistent with his having opened it by force.[3] Marzan Decl., Ex. E, 9:13–9:15, 10:13–10:14, 11:7–11:9. There is also evidence that Mr. Mitchell was known not to lock the wooden door, and that the rake could have caused the inner wooden door to open as well as the outer security door. *Id.* Decl. C, 38:25–39:25.

Plaintiffs present a declaration from an expert, Roger Clark, asserting that Mr. Mitchell rather than the police opened the two doors. Mr. Clark states that the damage done to the security door is consistent with inserting the rake only; if defendant Lombardi had actually opened the security door, he would have done significant damage to the door frame. Clark Decl. ¶ 17.[4] Clark does not claim that he actually examined the door; rather, he bases his opinion on photographs taken by the police and on alleged statements by plaintiffs that they examined the doors when they visited the apartment the day after the shooting and that both doors worked perfectly. *Id.* (Plaintiffs have not submitted direct evidence that plaintiffs did examine the doors or of what they perceived.)

Mr. Clark also states that the inner door would show signs of damage if it had been forced open. Clark Decl. ¶ 17. Again, however, he did not actually examine the door to see if there were damage. Moreover, plaintiffs' expert does not address the amount of damage that would have been done to the door if it had been forced open without being bolted.

---

[3] At the coroner's inquest, defendant Lombardi stated that "the last time that I pulled it [the rake], the door came open. I ripped the door"; however, he "didn't see if the [wooden] door was open or not at that time." Marzan Decl., Ex. C., 71:17–71:22. In his deposition, he testified that he observed that the interior door was still closed at the time that the security door came open, but then explained that although "the door was shut . . . there was – at the bottom appeared a gap like that at the bottom of the door where the door was, you know, ajar. It was closed to where you couldn't see anybody, but there was a slight, about maybe an inch or two, gap in the door." Marzan Decl., Ex. E, 12:22–13:2; *see also* Lombardi Decl. ¶ 9 ("Once I opened the metal security door, I observed that the front door was closed to where I could not see anybody, but was slightly ajar by one to two inches."). At the coroner's inquest, defendant Les Galer testified that when the security door "swung open" the wooden door was "about three to four inches ajar." Marzan Decl., Ex. C, 37:6–37:12.

[4] Noting that plaintiffs' opposition papers in this case were filed late, and that plaintiffs' evidence was filed later still, defendants ask the Court to decide this motion without considering the content of plaintiffs' filings. The Court declines to adopt such a severe sanction.

**B.     The shooting**

There is also some disagreement between the parties about where, when, and why defendant Les Galer shot Mr. Mitchell. At the coroner's inquest, defendant Les Galer testified as follows:

> [After the security door opened,] I found myself being right in front of this door that's open, unarmed, and already knowing that I've been out here for probably a minute now with somebody who's not going with the program.
> Needless to say, my adrenaline is up. I enter into the room very aggressively. The No. 1 thing you're taught in the police academy, and the No. 1 thing you're taught in any tactical environment, and the No. 1 thing I teach new recruits at the police academy, if you don't want to go home at the end of your shift, go through a doorway slowly. Or stand in it.

Marzan Decl., Ex. C, 37:19–38:4. All defendant Les Galer could see in the dark room was "the shoulders and the head silhouette-ish of what [he] perceived to be an African-American male" who was standing "towards the rear of the room." *Id.* 41:13–41:20.

> As I entered into the room, I met Mr. Mitchell in the middle of the room. I do not recall yelling at Mr. Mitchell to get on the floor. I don't have that conscious memory at all. Based on my training and experience and the number of search warrants and number of room entries I've been in, and the tactical experiences that I have had in law enforcement, I'm almost certain that I did say something along the lines of get on the ground. Show me your hands. . . .
> At this point in time, I'm estimated somewhere between probably a foot, maybe 18 inches from Mr. Mitchell. I have my firearm out in my right hand. I would not describe it as "locked out" like this (indicating); I was only holding it with one hand.
> At this point in time, I felt a grasp to the lower portion of my hand, right here, like this (indicating). I – . . . .
> My right wrist, holding my firearm (indicating).
> I gave a tug. And simultaneously – which the best I can describe it would be somewhat of a stiff arm, to gain separation. . . .
> As I pushed away from Mr. Mitchell to try to gain distance from him, I pulled my firearm back into my upper shoulder area. Fearing that he was – I was going to lose control of my firearm, and fearing for my life, I discharged my firearm one time and I struck Mr. Mitchell.

*Id.* 42:10–42:18; 43:2–43:9; 43:11–43:15; 43:23–44:3. At his deposition, defendant Les Galer clarified that the command to get down is something that he would say "Upon seeing a suspect. Upon seeing an individual. It's not a, it's not a command that coincides with merely walking through the door." Marzan Decl., Ex. B, 79:25–80:3. He also clarified that he held the firearm "Out in front of me" and "Pointed in the direction of where I was traveling," although he did not know "precisely" and "would say it was somewhere in the range of my torso." *Id.* 82:11–83:1. He did not have a "conscious recollection" of indexing his finger (putting it outside of the trigger wall on the rail of the gun rather than on the trigger) but is "certain" that he did because that is how he was trained "To avoid pulling the

7

trigger . . . when you're not trying to pull the trigger." *Id.* 97:6–98:20.

Defendant Phil Galer, Les Galer's identical twin brother, testified similarly.

> I brought up Les Galer – I watched Les – saw Les Galer go through the doorway. I was just about to enter that doorway when I heard a gunshot, a single gunshot.
> I continued through the doorway upon hearing the gunshot, and saw the back of Detective Les Galer standing approximately six to eight feet into the front room of the residence. And I observed an African-American male lying on his back at the feet of Detective Les Galer. . . .
> I grabbed his right shoulder and asked him hurriedly, "Are you shot?"
> He turned and said, "No, I'm not shot. He tried to grab my gun."

61:13–61:22; 62:3–62:6.

Plaintiffs' opposition to these motions focuses on defendant Lombardi's somewhat different testimony at the inquest:

> On the last time that I pulled it [the rake], the door came open. I ripped the door, you know, swinging outwards. Detective Dexter was outside. Detective Les Galer was kneeled at the front of the door, the doorjamb. I didn't see if the door was open or not at that time.
> So I dropped the pick, and I immediately went to arm myself. I'm left-handed, so I had the same drop type tactical holder that they were talking about. So I pulled my weapon out. Detective Les Galer was kneeling there. There is a little bit of a lag time because of where the second team members were stacked up.
> I started to flow with Les. His brother, Phil Galer, came almost simultaneously. I had my — because I am — I'm left-handed, I had my gun at the ready, kind of tucked, and I had my hand up on Phil's — or Les's right side.
> I felt him stop as we entered the room. And his right arm came back. And I'm trying to push, because, like he said, you got to get through that door because the fatal funnel type situation that we are encountering. So I am trying to push him through.
> So I hear a pop, the muzzle — the firearm going off. I didn't know if he got shot, somebody inside the room shot at us. It was pitch black in there, you couldn't see anything.
> I asked, and Phil was asking at the same time, "Are you hit? Are you shot?" And Les goes, "He tried to grab my gun."

Yourke Decl., Ex. 5, 71:17–72:21.

Defendant Lombardi has since disclaimed some of this testimony, explaining that he "would defer" to defendant Phil Galer's memory of entering the apartment second after defendant Les Galer, because defendants Phil Galer and Les Galer are identical twins and defendant Lombardi cannot tell them apart. Lombardi Decl. ¶ 10. He also states that "push . . . does not mean to shove or exert force," but rather it "refers to th[e] technique of placing one's hand on the officer in front of him to determine which direction he or she is moving." *Id.* ¶ 11.

Plaintiffs' expert, Mr. Clark, criticizes many of the statements made by the defendant police

8

1 officers. For example, Mr. Clark states that "'Push' is not a police term of art. When Officer Lombardi
2 testified at the inquest that he 'pushed' Officer [Les] Galer to get him through the door, he meant exactly
3 what he said." Clark Decl. ¶ 18. In response to defendant Les Galer's statement that he would have
4 shouted (and probably did shout) for Mr. Mitchell to get down only once he actually saw Mr. Mitchell,
5 Clark states that defendant Les Galer "violated standard policies and procedures by failing to shout 'Get
6 Down!' prior to making entry and thereby giving Mr. Mitchell sufficient warning to get out of the way
7 because he, Galer was coming in." *Id.* ¶ 19. Clark also opined, based on defendant Les Galer's lack
8 of specific memory of how he held the gun, that defendant Les Galer entered the room "with his firearm
9 held in front of him at shoulder height and with his index finger on the trigger." *Id*. ¶¶ 19, 23. He stated
10 that this, in combination with the tardy warning, "created a situation in which a dangerous collision
11 between himself and Mr. Mitchell became practically inevitable." *Id.* Clark believes that defendant Les
12 Galer "rushed through the door and into the apartment and then came to a sudden stop in the doorway
13 when he was confronted with the subject who had just opened the front door pursuant to the police
14 orders. [He] violated basic protocol by rushing in first when he was not supposed to do so and he created
15 confusion and a collision with other squad members, especially officer Lombardi and possibly his
16 brother." *Id.* ¶ 22. Clark also relies to some extent on the report of a biomechanics expert, Jesse
17 Wobrock, that plaintiff is no longer relying on as an expert witness. Clark concludes that "Officer Les
18 Galer either (1) discharged his firearm accidentally due to his being pushed from behind by Officer
19 Lombardi and also possibly colliding with Mr. Mitchell just inside the doorway, or (2) discharged his
20 firearm intentionally out of extreme fear when he confronted Mr. Mitchell just inside the doorway." *Id.*
21 ¶ 14. If Mr. Mitchell grabbed his wrist at all, it was "probably . . . to avoid being killed" and
22 "instinctive[]." *Id.* ¶ 24.

### IV. **The forensics**

25 The medical examiner found "fine punctate stippling" on Mr. Mitchell's body but not soot or
26 other stippling, meaning that the barrel of the gun was located between six inches and two feet from his
27 body when he was shot. Josselson Decl. ¶¶ 3, Ex. A at C7. The bullet had entered his neck on the right
28 side and lodged in the left side of his torso approximately 27 inches from the top of his head. *Id* ¶ 6.

9

Mr. Mitchell was approximately five feet eleven inches; defendant Les Galer was approximately six feet five inches. Marzan Decl., Ex. C, 15:10; L. Galer Decl. ¶ 15. The only other fresh injury that the examiner noted was an abrasion on Mr. Mitchell's right elbow. Josselson Decl. & Ex. A. Some amount of gunshot residue was found on both of Mr. Mitchell's hands. Marzan Decl., Ex. G.

Currently before the Court are two motions for summary judgment, one filed by defendant Wielsch, and the other filed separately by the other defendants in this case.

**LEGAL STANDARD**

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).[5] The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id*. at 324 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

---

[5] Defendant Wielsch's motion was filed before the most recent revision of Rule 56 went into effect, but argued after. The remaining defendants' motion was filed after the revision of Rule 56 went into effect. The standard for granting summary judgment has not changed. As the Committee notes on the recent amendment state:

> Rule 56 is revised to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Citations are to the new rules unless otherwise noted. The Court does not discuss the new rules in more detail, however, as the changes are not relevant to this case.

475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id*. However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)(2).

## DISCUSSION

### I. The Fourth Amendment claim

Plaintiffs challenge the manner in which the police executed the search warrant and detained Mr. Mitchell from the moment that defendants created an operational plan to the moment that Mr. Mitchell was shot and killed.[6] Plaintiffs argue that it was unreasonable to fail to verify Mr. Mitchell's criminal history, it was unreasonable to plan to use a 7:00 a.m. "tactical entry" given the true circumstances of the case, it was unreasonable actually to enter Mr. Mitchell's apartment because the delay in forcing open the security door compromised the execution of the warrant, it was unreasonable for Les Galer to enter the apartment when and how he did given how the plan had been executed so far, and it was unreasonable to shoot Mr. Mitchell because he was cooperating fully. Pl. Opp. 12, 20, 22. Even if the shooting were reasonable at the moment it happened, plaintiffs argue, earlier independent Fourth Amendment violations in executing the warrant mean that the police may still be held liable for use of excessive force. Pl. Opp. 18.

As the Ninth Circuit has explained, "if the police committed an independent Fourth Amendment

---

[6] Plaintiffs do not challenge the validity of the warrant or the constitutionality of conducting *some* search of Mr. Mitchell's residence. Additionally, plaintiffs do not challenge the authority of police officers executing the search warrant to seize Mr. Mitchell, who himself was listed to be searched on the warrant.

11

violation by using unreasonable force to enter the house, then they could be held liable for shooting the man—even though they reasonably shot him at the moment of the shooting—because they used excessive force in creating the situation which caused [the man] to take the actions he did." *Billington v. Smith*, 292 F.3d 1177, 1188 (9th Cir. 2002) (internal quotation marks omitted) (alteration in original). One the other hand, "if a police officer's conduct provokes a violent response, . . . but is objectively reasonable under the Fourth Amendment, the officer cannot be held liable for the consequences of that provocation regardless of the officer's subjective intent or motive." *Id.* at 1190.

Thus, the Court examines, independently, the reasonableness of the method of the execution of the search warrant and the reasonableness of the use of lethal force.

### A.   Reasonableness of the method of the execution of the search warrant

"[T]he method of an officer's entry into a dwelling [is] among the factors to be considered in assessing the reasonableness of a search or seizure." *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995). This is so even where the police have obtained a valid search warrant. *See id.* at 929. The police must "strike[] the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by" the execution. *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). For example, "[i]n order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Id.* If the police do knock and announce their presence, they may still force their way into a residence if the "totality of circumstances in a given case" make such forced entry reasonable, because "there is no reason to treat a post-knock exigency differently from the no-knock counterpart." *United States v. Banks*, 540 U.S. 31, 36, 40 (2003); *see also id.* at 39–40 (holding that the 15 to 20 second pause before forcing entry was reasonable based on considerations of destruction of drug evidence, without regard to how long it would have taken the occupant to answer the door); *id.* at 42 (explaining that an officer may also force entry "if, after notice of his authority and purpose, he is refused admittance."). However, "The lawfulness of the [entry] team's original plan is not relevant to [the Court's] consideration; [the Court's] role is to evaluate

the events as they actually transpired." *United States. v. Peterson*, 353 F.3d 1045, 1051 (9th Cir. 2003).

Plaintiffs argue, essentially, that using an armed group of police officers to force entry into an occupied residence at seven in the morning in order to execute a search warrant for evidence of small-scale marijuana transactions was dangerous and unnecessary and therefore did not "strike[] the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by" the execution.[7]

On plaintiffs' side, there is evidence that the police chose tactics that, while intended to decrease the danger to the officers, also actually increased the danger to Mr. Mitchell. There is evidence that defendants believed Mr. Mitchell had an adult felony conviction, that they also believed Mr. Mitchell might not have an adult felony conviction, and that they erred on the side of assuming he did rather than addressing their suspicions that he did not. There is evidence that they considered this conviction when determining when and how to enter Mr. Mitchell's residence. And there is evidence that the time and method that they chose constituted a "dangerous technique" for serving the warrant. Clark Decl. ¶ 13.

However, there is also evidence that they were significantly more worried about Mr. Mitchell's loaded and easily accessible short barrel shotgun than they were about his history. Dexter Decl. ¶ 15; Marzan Decl. Ex. A, 22:1. There is no question that Mr. Mitchell knew that the police were attempting to gain entry to his residence in order to execute a search warrant. There is uncontested evidence that Mr. Mitchell was evasive when asked to open his door, that he never indicated to the police an intent

---

[7] Plaintiffs rely primarily on the expert report of Mr. Clark to argue that defendants' actions were unreasonable. As mentioned above, Mr. Clark relies in part on the report of a purported biomechanics expert who will not be testifying in this case, and in part on the hearsay statements of plaintiffs regarding the damage done to their son's doors. "If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data [upon which an expert bases an opinion or inference] need not be admissible in evidence in order for the opinion or inference to be admitted." Fed. R. Ev. 703. The converse is also true. To the extent that Mr. Clark's opinions or inferences rely on a report prepared by an expert upon whom plaintiff no longer relies or the statements of the parents of the shooting victim, none of which are not presented as evidence to the Court, plaintiffs cannot rely on the expert report to defeat defendants' motions for summary judgment.

And in fact, much of Mr. Clark's declaration relies on the assumption that the two doors were not particularly damaged and that the forensic reports do not support defendant Les Galer's description of the shooting. This is, in part, how he concludes that defendant Les Galer entered the apartment with his finger on the trigger of his shoulder-height held handgun, even though defendant Les Galer has presented evidence that his finger was "indexed" (held out straight next to the trigger) and that his gun was at "low ready" (pointed down) at the time that Mr. Mitchell first grabbed hold of his hand.

to open the door or cooperate, and that he in fact shouted over the sound of the rake that the police had the wrong address. Defendants created a plan for how to execute the warrant and followed the plan, except to the extent that they responded to unexpected events such as the wooden door being open. The police chose legal entry tactics that did not require special prior approval by the courts. *See* Cal. Penal Code § 1531 (permitting an officer to break open doors to execute warrants if, "after notice of his authority and purpose, he is refused admittance"); Cal. Penal Code § 1533 (in the absence special permission from the magistrate, a search warrant "shall be served only between the hours of 7 a.m. and 10 p.m.").

Plaintiffs have undoubtedly raised factual questions as to whether defendants made tactical decisions that increased the danger to Mr. Mitchell, and perhaps whether they made mistakes or strayed from recommended or preferred police practices. But the constitution does not require officers to "ascertain the *least* intrusive alternate (an inherently subjective determination) and choose that option and that option only." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) (emphasis in original). Nor does it require perfection. Rather, the constitution requires police officers to enter homes they intend to search in a reasonable manner—and what constitutes a reasonable manner can change from moment to moment as events unfold.

Even before the shooting, things had gone wrong. The evidence, however, even as viewed in the light most favorable to plaintiffs, does not support a finding that defendants' manner of entry violated the constitution by failing to "strike[] the appropriate balance between the legitimate law enforcement concerns [and] . . . individual privacy interests." *Richards*, 520 U.S. at 394. Therefore, to the extent that plaintiffs make an unreasonable entry claim, all defendants are entitled to summary judgment.

### B. Excessive force

The Ninth Circuit explains a constitutionally excessive force claim as follows:

> An officer's use of excessive force to effect an arrest is a violation of a person's Fourth Amendment right to be free from unreasonable searches and seizures. *Graham v. Connor*, 490 U.S. 386, 395 (1989). A citizen's claim that a law enforcement officer used excessive force is analyzed under an "objective reasonableness" standard. *Id.* at 395, 399. Determining whether the force used is reasonable requires a balancing of "the nature and

14

> quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks and citations omitted). Further, the "standard of reasonableness at the moment applies." *Id.* The reasonableness of the use of force is judged from the perspective of a reasonable officer on the scene—not from the perspective of the person seized or of a court reviewing the situation with 20/20 hindsight. *Id.*

*Bryan v. MacPherson*, --- F.3d ----, 2010 WL 4925422, * 8 (9th Cir. 2010). Thus, the Court is to apply a "balancing test" that

> entails consideration of the totality of the facts and circumstances in the particular case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

*Blanford v. Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005) (quoting *Graham*, 490 U.S. at 396). When the excessive force is deadly force, it "satisfies Fourth Amendment standards '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

Defendant Les Galer has asserted throughout the proceedings related to the shooting that he shot Mr. Mitchell after Mr. Mitchell grasped hold of the hand in which defendant Les Galer was holding his gun, and that Mr. Mitchell did not let go of the hand even as defendant Les Galer pulled his arm back. This corresponds to his statement, made seconds after he had shot and killed Mr. Mitchell that "he tried to take my gun." Marzan Decl. Ex. C at 62:5–62:6; *see also* Fed. R. Ev. 803 (listing as exceptions to the hearsay rule "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" and "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"). It also is consistent with the forensic record in the case, including the heights of Mr. Mitchell and defendant Les Galer, the angle of entry of the bullet, and the presence of some gun powder residue on Mr. Mitchell's arms. Even plaintiffs' expert, who takes issue with many of defendants' explanations of their actions, states that Mr. Mitchell may well have grabbed defendant Les Galer's wrist.

The question for the Court is whether it is reasonable for a police officer executing a knock-and-announce warrant in the early morning to look for evidence of marijuana sales to shoot the suspected marijuana seller after that person grabs and keeps hold of the police officer's dominant wrist, in which

15

the police officer is holding a gun, even as that police officer tries to free his hand. The reasonableness is judged from the perspective of an officer at the scene—that is, an officer who heard Mr. Mitchell's evasive responses to the police announcement of their presence, who believes that his follow officer forced open the doors, who is faced with an individual who is not responding to new commands to get down on the ground, and who knows that his gun wrist has been grabbed but does not know or have time to find out why. A reasonable officer in that situation could believe, just as defendant Les Galer says he believed, that he risked losing control of his firearm. Marzan Decl. Ex. C at 44:1. He could believe that he faced the same danger as he would face if a person attempted to grab his actual gun. *See* Les Galer Decl. ¶ 13 ("I was . . . trained that my gun is an extension of my hand and that any effort by a suspect to grab my hand is the same a grabbing my gun."). Although plaintiffs' expert asserts that Mr. Mitchell may have grabbed defendant Les Galer's wrist instinctively to protect himself from the gun, plaintiffs have not presented any evidence that a reasonable police officer would be able to know why a person had grabbed his gun wrist or that a reasonable police officer would not respond to such an act through a use of lethal force.

Thus, there is strong, uncontested evidence in this case that Mr. Mitchell posed an immediate threat to the safety of the officers.[8] There is also evidence that a reasonable police officer would have viewed Mr. Mitchell as actively resisting legal police directives and possibly attempting to evade arrest

---

[8] When asked at the hearing whether there was any evidence that would raise a question of fact with regard to whether or not Mr. Mitchell grabbed defendant Les Galer's gun wrist, plaintiffs cited defendant Lombardi's testimony at the coroner's inquest as well as supposed blood spatter evidence. Defendant Lombardi's testimony raises an issue of fact as to where precisely the officers were standing, in what order they entered the apartment, and whether defendant Les Galer was pushed from behind while entering the apartment. It does not raise an issue of fact as to whether or not Mr. Mitchell grabbed defendant Les Galer's wrist, which is the critical question before the Court, and therefore it does not create a genuine issue of material fact that would defeat defendants' motions for summary judgment.

As for blood and blood splatter, plaintiffs repeatedly discussed blood and blood splatter during the hearing. However, the only evidence that plaintiffs have presented are a police report that defendants argue is inadmissible hearsay, and images that plaintiffs label as photographs of "blood spatters" and which the Court assumes are intended to be photographs of the blood referenced in the police report. *See* Yourke Decl. ¶¶ 6–7 & exs. 5–6. Assuming that the police report is admissible, it is evidence that EMTs treated Mr. Mitchell on the scene before the police noted or photographed any blood. *See id.* Ex. 6 at P16 ("[Mr. Mitchell] had two adhesive EKG pads attached to the upper portion of his chest and he appeared consistent in appearance with an individual who had received emergency medical treatment."). The Court could not possibly draw any inferences in favor of plaintiffs from the record as it exists with regard to blood.

entirely—potentially by taking a police officer's gun and shooting his way out of his apartment. *Cf. Billington*, 292 F.3d at 1185. Finally, there is evidence that a reasonable police officer would see the crimes at issue not merely to be marijuana sale and resisting lawful commands, but also a completed simple assault of a police officer and the nascent stages of robbery or even attempted assault with a deadly weapon. Additionally, although Mr. Mitchell did not have the shotgun on his person (presumably this would have been readily apparent to a reasonable officer on the scene despite the darkness in the room, as Mr. Mitchell was wearing a white t-shirt and boxer shorts), a reasonable officer on the scene would not have known that the shotgun was in Mr. Mitchell's bedroom or how easy it would be for Mr. Mitchell to access the weapon.

Again, things went wrong, and a police officer shot and killed a young man. Again, however, the evidence, even as viewed in the light most favorable to plaintiffs, does not support a finding that defendant Les Galer's use of deadly force was objectively unreasonable at the moment that he shot Mr. Mitchell. Defendants are entitled to summary judgment on the Fourth Amendment claim.

## II.     Fourteenth amendment claim

Plaintiffs' second claim is for violation of the parents' Fourteenth Amendment due process "right to enjoy family relations with their son and to enjoy his companionship and society." TAC ¶¶ 43–44. This claim is based on the same facts as the Fourth Amendment claim.

A substantive due process claim under the Fourteenth Amendment based on deprivation of the liberty interest arising out of familial relations may be asserted by the children of a person killed by law enforcement officers. *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir.1998). The Fourteenth Amendment inquiry is distinct from a Fourth Amendment excessive force claim, however. *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (analyzing each claim separately).

Under the Fourteenth Amendment, "only official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). "In determining whether deliberate indifference is sufficient to shock the conscience, or whether the more demanding standard of purpose to harm is required, the critical consideration [is] whether the circumstances are such that actual deliberation is practical." *Tennison v. City & County of San*

*Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009) (internal quotation marks omitted) (alteration in original). This is so because an officer faces a "fast paced, evolving situation presenting competing obligations with insufficient time for the kind of actual deliberation required for deliberate indifference." *Porter*, 546 F.3d at 1142. So, for example, if a suspect acts in an evasive manner that requires officers to react quickly, the officers may be held liable only if they acted with a purpose to harm. *Porter*, 546 F.3d at 1140. A purpose to harm means "a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson*, 610 F.3d at 554.

Here, plaintiffs' Fourteenth Amendment claim is based on the killing of Mr. Mitchell, which deprived them of their liberty interest to enjoy their family relations with Mr. Mitchell. Thus, the question is whether some act by defendants that would shock the conscience was both the but-for cause and the proximate cause of Mr. Mitchell's death.

It is not clear which standard (deliberate indifference or intent to harm) should be used to evaluate the acts that led up to the shooting. However, the Court need not decide the question, because plaintiffs have not pointed to any action or series of actions preceding the shooting that would fail the deliberate indifference test, and which was the legal and factual cause of Mr. Mitchell's death. Even if defendant Dexter had an obligation to verify Mr. Mitchell's criminal history and was deliberately indifferent to that obligation, there is no evidence to support a finding that this caused Mr. Mitchell's death. Even if defendants could have come up with a better and safer plan for executing the warrant, there is no evidence to support a finding that they were deliberately indifferent to the danger that their plan presented, and ad hoc decision making both by defendants and by Mr. Mitchell would have broken any chain of causation.

While defendants' earlier actions may be subject to the deliberate indifference standard, all the evidence indicates that defendant Les Galer did not have time to deliberate before shooting Mr. Mitchell, and therefore the intent to harm standard applies to that action. There is no evidence to support a finding that defendant Les Galer pulled the trigger with any intent other than to protect himself or other police officers—a purpose clearly related to legitimate law enforcement objectives. Defendants are entitled summary judgment on the Fourteenth Amendment claim.

### III. Claims for failure to train and failure to supervise

Plaintiffs bring two claims against defendant Wielsch only, for failure to train and failure to supervise. TAC ¶¶ 50–55. Defendant Wielsch argues that he cannot be held liable for failure to train or failure to supervise because those claims can only survive if the person that should have been trained or supervised actually violated a constitutional right.

Failure to train and failure to supervise claims, like all claims brought under Section 1983, require a showing of a violation of a constitutional right. *See Lee v. City of Los Angeles,* 250 F.3d 668, 681 (9th Cir. 2001) ("[A] plaintiff must show that his or her constitutional injury would have been avoided had the governmental entity properly trained its employees"); *Scott v. Henrich*, 9 F.3d 912, 916 (9th Cir. 1994) ("[T]here was no violation of the decedent's constitutional rights, and thus no basis for finding the officers inadequately trained."); *Wereb v. Maui County*, --- F. Supp. 2d ----, 2010 WL 2985622, * 16 (D. Hawaii 2010) (applying the municipal liability standard in *Lee* to determine the liability individual supervisors). Thus, plaintiffs need to show, for example, that Mr. Mitchell was subjected to constitutionally excessive force, or that he was shot in a manner that would shock the conscience, and not merely that he was killed. The Court has found that the officers are entitled to summary judgment on the Fourth and Fourteenth Amendment constitutional claims. By extension, defendant Wielsch is entitled to summary judgment on the failure to train and failure to supervise claims.

### IV. Wrongful death claim

Plaintiffs also bring a state law wrongful death claim against all defendants except Wielsch. California Code of Civil Procedure § 377.60(b) permits parents to bring a "cause of action for the death of a person caused by the wrongful act or neglect of another." "The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Center*, 140 Cal. App. 4th 1256, 1264 (2006). To prove the tort, plaintiffs must show that defendants violated their duty of care towards Mr. Mitchell, which was "the duty to use reasonable force under the totality of the circumstances." *See Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526 n. 10 (2009) (explaining that the

same duty is owed to bystanders and suspects).

Defendants assert that they cannot be held liable under state law because the shooting was a justifiable homicide. "Under Penal Code section 196, a police officer who kills someone has committed a justifiable homicide if the homicide was necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 533 (2009) (internal quotation marks omitted). "The test for determining whether a homicide was justifiable under Penal Code section 196 is whether the circumstances reasonably create[d] a fear of death or serious bodily harm to the officer or to another." *Id.* (internal quotation marks omitted) (alteration in original).

As discussed above with regard to plaintiffs' Fourth Amendment claim, defendant Les Galer had an objectively reasonable fear of death or serious bodily harm when he shot Mr. Mitchell. Because, under California Penal Code Section 196, defendant Les Galer committed a justifiable act of homicide, Mr. Mitchell's death was not "caused by the wrongful act or neglect of another," and no defendant may be held liable for wrongful death. Defendants are entitled to summary judgment on this claim.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants Wielsch's motion for summary judgment. (Doc. 75.) The Court also GRANTS the remaning defendants' motion for summary judgment. (Doc. 79.)

**IT IS SO ORDERED.**

Dated: January 26, 2011

SUSAN ILLSTON
United States District Judge