1
2
3
4
5
6
7
8

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

9   TIMOTHY MITCHELL, SR., et al.            No. C 09-00794 SI

10          Plaintiffs,                       **ORDER GRANTING IN PART
                                              DEFENDANTS' MOTIONS FOR
11      v.                                    REINSTATEMENT OF SUMMARY
                                              JUDGMENT; SETTING BRIEFING
12   CITY OF PITTSBURG, et al.,               SCHEDULE ON QUESTION OF
                                              IMMUNITY**
13          Defendants.
                                    /
14

15          On June 22, 2012, defendants Lester and Phil Galer, Sean Dexter, and Louis Lombardi moved

16   for reinstatement of the Court's January 26, 2011 Order Granting Defendants' Motions for Summary

17   Judgment, which had been vacated by the Court's September 2, 2011 Order Granting Relief from Final

18   Judgment. Dkt. 195. On June 22, 2012, defendant Norman Wielsch separately moved for same. Dkt.

19   203. Plaintiffs filed an opposition on July 9, 2012, and defendants replied on July 16, 2012. Dkts. 206,

20   212, 214. A hearing was held on this matter on July 27, 2012. Having considered the arguments of the

21   parties, and for good cause shown, the Court finds as follows.

22

23                                          **BACKGROUND**

24          This suit arises out of the shooting death of decedent Timothy Mitchell, Jr. by defendant police

25   officer Lester Galer on March 11, 2008. Defendant Les Galer was a police officer employed by the City

26   of Pittsburg, and was a member of the Contra Costa County Narcotics Enforcement Team ("CCCNET").

27   The shooting occurred while several officers were attempting to execute a search warrant at Mr.

28   Mitchell's apartment. The plaintiffs in this case are Timothy Mitchell, Sr. and Paulette Mitchell, the

United States District Court
For the Northern District of California

parents of Timothy Mitchell, Jr.  Plaintiffs bring a Fourth Amendment claim under 42 U.S.C. § 1983 against all defendants for violation of Timothy Mitchell, Jr.'s civil rights, arguing that the manner in which each "attempted to execute the search warrant was unreasonable and created a grave and unnecessary danger to Decedent and proximately caused Decedent's death." TAC ¶¶ 41-42.  Plaintiffs also bring a Fourteenth Amendment claim for violation of the parents' right to enjoy family relations, and failure to train and supervise claims against commanding officer Wielsch. *Id.* ¶¶ 50-55.

On January 26, 2011, the Court granted the summary judgment motions filed by the five defendants who remained in this case, all of whom are or were police officers:  Les Galer and his identical twin brother Phil Galer, Sean Dexter, Louis Lombardi, and Norman Wielsch.  Judgment was entered against plaintiffs, and they appealed.  However, while the appeal was pending in the Ninth Circuit, defendants Wielsch and Lombardi were arrested and indicted for various corruption-related offenses, including the procurement and sale of marijuana and methamphetamines, theft, and the abuse of their authority as police officers.  Following the indictments, the Court issued an Order in which it indicated that, on its own motion, it wished to order further briefing in this case. *See* Doc. 139 (citing Fed. R. Civ. P. 60(b); *Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*, 168 F.3d 347, 352 (9th Cir. 1999)).  The Court requested that the United States Court of Appeals for the Ninth Circuit grant a limited remand to allow the parties to brief, and the Court to consider, the following issue:

> Whether the criminal indictment of two of the defendants in this case has any impact on this case, such that plaintiffs should be relieved from the final judgment under Federal Rule of Civil Procedure 60(b).

The Ninth Circuit remanded the case to this Court to permit the Court to consider the described Rule 60 motion.  Following briefing on the issue, the Court granted relief from final judgment.

## I.      The Events of March 11, 2008

### A.      Investigation and Lead-Up to Warrant Execution

The parties generally agree about what happened up to the point where the police began to knock and announce their presence to Mr. Mitchell.  Defendant Dexter was the case agent or lead investigator for the search warrant.  Dexter Decl. ¶ 8.  According to Dexter, a confidential informant told defendant

Dexter that an African-American man named Tim was selling marijuana out of 1017 H Street, Apartment 19, in Antioch, California. *Id.* ¶ 9.[1] Timothy Mitchell, Jr. lived in that apartment. *Id.* ¶ 11. The confidential informant identified Mr. Mitchell's photograph. *Id.* ¶ 12. Defendant Dexter found two criminal records associated with Mr. Mitchell's name and birth date, one of which included an adult felony conviction for robbery, as well as a number of arrests for drug-related Health and Safety Code crimes. *Id.* ¶ 13; *Id.* Ex. A at WN21. (It turns out that the criminal record that included the adult felony conviction belonged to a different individual.[2]) Defendant Dexter secured a warrant to search Mr. Mitchell's apartment and Mr. Mitchell. *Id.* Ex. A at WN13–WN15. At some point, the confidential informant told defendant Dexter that Mr. Mitchell kept a sawed off shotgun by the front door, although this detail is not included on the search warrant application. *Id.* ¶ 9 & Ex. A.

Mr. Mitchell's apartment is located on the second floor of a two-story U-shaped complex. Marzan Decl. Ex. A, 66:19–66:20. There is a "cat walk" that goes around in front of the apartments on the second floor that is approximately three feet wide. *Id.* Ex. C, 30:9–30:10. The front door to the apartment has a metal "security door" in front of it with bars arranged in a "star burst" pattern made up primarily of diagonally placed beams. *See* Lombardi Decl. Ex. A (photographs). The security door opens out onto the catwalk, with hinges on the right hand side. *See id.* The interior wooden door opens into the apartment, with hinges on the same side. *See id.* Immediately to the left of the door are a fire extinguisher and what appears to be an air conditioning unit; several feet to the left and right of the doors are two large windows. *See id.*

Defendant Wielsch was the CCCNET task force commander, and he oversaw the operation in this case. Wielsch Decl. ¶¶ 3, 11. With the help of defendant Les Galer, defendant Dexter formed a plan to execute the search warrant that involved a "tactical entry" (which the parties explain means

---

[1]     Pursuant to discovery that has occurred since the Court re-opened this case, as discussed in more detail below, Dexter's description of the confidential informant's disclosures has been confirmed. Edrington Decl. in Support of Supp. Br. in Support of Mot. for SJ, Ex. A (Dep. of Confidential Informant).

[2]     Defendant Dexter disclosed on the warrant application that he had found two different criminal records that appeared to belong to the same Timothy Mitchell, Jr. Marzan Decl. Ex. D, 16:18–16:19. Although it struck him as odd or peculiar, he did not look into the issue because it was not "germane" to his investigation. Yourke Decl. Ex. 1, 15:23–16:1, 20:10–20:17.

United States District Court
For the Northern District of California

forcible entry into a residence where people are present, in this case Mr. Mitchell). Defendant Wielsch explained that CCCNET rejected any plan that would involve waiting for Mr. Mitchell to exit the building, as defendant Dexter had been informed that Mr. Mitchell would often remain in the apartment for days on end, and the apartment complex was not arranged in such a way that the members of CCCNET would be able to conduct surveillance of his apartment for a long period without being noticed. Additionally, CCCNET rejected any plan to lure Mr. Mitchell out of his apartment with a controlled buy, as they had been told that Mr. Mitchell sold marijuana from inside his apartment. Marzan Decl. Ex. A, 66:13–68:15.

The team decided to execute the warrant at approximately seven in the morning, when "[t]here was a higher probability that [Mr. Mitchell] would not be sitting in the living room armed with his shotgun." Dexter Decl. ¶ 15. Although the decision was influenced in part by the police officers' belief that Mr. Mitchell had an adult felony conviction, defendant Wielsch "still would have approved the operation" if he had known this not to be true. Marzan Decl. Ex. A, 22:1.

Around seven on the morning of March 11, defendant Dexter crossed in front of and stood to the right of Mr. Mitchell's door, where he knocked and announced that the police were present with a search warrant. Dexter Decl. ¶¶ 18–21. Defendant Lombardi stood to defendant Dexter's left with a "rake" or "pick," which he brought in order to force open the metal security door if necessary. Defendant Les Galer kneeled to defendant Lombardi's left with a "key" or "ram," which he brought in order to force open the interior wooden door if necessary. *Id.* Five other officers, including defendant Phil Galer and defendant Wielsch, remained approximately six feet to the left of the door until the doors were opened, in order not to be seen through the window. Wielsch Decl. ¶ 19; Marzan Decl. Ex B, 52:22–53:3. Of that group, defendant Phil Galer stood closest to the door. Marzan Decl., Ex. D, 26:17–26:18.

### B.        Execution of the Warrant

The parties agree as to the approximate sequence of events that occurred when defendants executed the search warrant. Defendant Lombardi began to use the rake on the security door. Approximately one minute after defendant Dexter first knocked and announced the police presence, the

security door opened.  The interior wooden door was open several inches.  Defendant Les Galer dropped the ram, unholstered and raised his gun, pushed open the door, and started to walk into the apartment. He shot and killed Mr. Mitchell.  Inside the apartment, the police officers found marijuana, evidence of marijuana sales such as a digital scale and a box containing plastic sandwich bags, and, in the bedroom, a loaded sawed-off shotgun.  Dexter Decl. Ex. A at WN26.

The disagreement in this case is over what exactly happened between the time that defendant Dexter knocked to announce the police presence and the time that defendant Les Galer killed Mr. Mitchell.  To prove what happened, defendants rely primarily on statements they made at a coroner's inquest, in depositions, and in declarations attached to these motions.  In opposition, plaintiffs rely primarily on the declaration of Roger Clark, their expert on police procedure, as well as some of the testimony by defendant Lombardi at the coroner's inquest.

### C.   The doors

At the coroner's inquest, defendant Lombardi stated that he began to use the rake after defendant Dexter knocked and announced the police presence and request for entry for the second time, that the rake made an incredible amount of noise, and that all he could hear while using the rake was defendant Dexter yelling "'Come to the door.  Come to the door.'"  Marzan Decl., Ex. C, 70:3–71:16.  In a later declaration, defendant Lombardi stated that he also heard "A male voice coming from inside the apartment" that "stated, 'Hang on.'" Defendant Dexter continued to yell "'Police Department.  Search warrant.  Come to the door.'"  And then, "after some delay, the person inside stated 'You got the wrong place.'"  Lombard Decl. ¶ 6; Dexter Decl. ¶ 22. At that point, defendant Dexter told him to "Rip the door," and he attempted to do so.  Lombardi Decl. ¶¶ 6–7.

At the coroner's inquest, defendant Les Galer stated that defendant Dexter said something to the effect of "Go to your door and open it" several times, in a manner that sounded like he was conversing with a person rather than commanding him.  Marzan Decl., Ex. C, 34:20–34:7.  At that point, defendant Les Galer could not hear anything that was happening inside of the apartment until he heard a voice state "you have the wrong house." *Id.* 34:25–35:1; 36:6–36:7.  In a later declaration, defendant Les Galer clarifies that it was after the dialogue between defendant Dexter and the occupant (he "could not hear

the occupant's initial response") that defendant Dexter "gave the command to Det. Lombardi to pull open the metal security door with the snatch. At about that time, I heard a male voice inside the apartment yelling, 'You have the wrong house,' two or three times." L. Galer Decl. ¶¶ 21–22.

Defendant Dexter states in a declaration that he repeated his knock and announce, after which he heard "a male voice from inside the apartment state[], 'Hang on.'" Dexter Decl. ¶ 22. He continued to pound and shout, and "after some delay, the person inside in the same male voice stated, 'You got the wrong place.'" *Id.* He "then heard another officer on the other side of the doorway state, 'Come to the door. It's the police. Come to the door.' When the resident did not open the door in response to my commands, I told Lombardi to open the door with the pick." *Id.* ¶ 23.

Defendant Lombardi is certain that he is the one who forced the security door open, and that he could see a rip and a bend in the door consistent with his having opened it by force.[3] Marzan Decl., Ex. E, 9:13–9:15, 10:13–10:14, 11:7–11:9. There is also evidence that Mr. Mitchell was known not to lock the wooden door, and that the rake could have caused the inner wooden door to open as well as the outer security door. *Id.* Decl. C, 38:25–39:25.

Plaintiffs argue that Mitchell opened both doors. In support, they present a declaration from an expert, Roger Clark, asserting that the damage done to the security door is consistent with inserting the rake only; if defendant Lombardi had actually opened the security door, he would have done significant damage to the door frame. Clark Decl. ¶ 17.[4] Plaintiffs also attach pictures of both doors. Yourke

---

[3]       At the coroner's inquest, defendant Lombardi stated that "the last time that I pulled it [the rake], the door came open. I ripped the door;" however, he "didn't see if the [wooden] door was open or not at that time." Marzan Decl., Ex. C., 71:17–71:22. In his deposition, he testified that he observed that the interior door was still closed at the time that the security door came open, but then explained that although "the door was shut . . . there was – at the bottom appeared a gap like that at the bottom of the door where the door was, you know, ajar. It was closed to where you couldn't see anybody, but there was a slight, about maybe an inch or two, gap in the door." Marzan Decl., Ex. E, 12:22–13:2; *see also* Lombardi Decl. ¶ 9 ("Once I opened the metal security door, I observed that the front door was closed to where I could not see anybody, but was slightly ajar by one to two inches."). At the coroner's inquest, defendant Les Galer testified that when the security door "swung open" the wooden door was "about three to four inches ajar." Marzan Decl., Ex. C, 37:6–37:12.

[4]       At summary judgment, the Court largely discounted Clark's testimony based on the fact that he had not examined the doors himself; rather, he relied on the photos of the doors as well as Mitchell's parents' testimony that the doors functioned perfectly the day after the shooting. The Court noted that plaintiffs did not attach declarations stating they had examined the doors or what they perceived. The Court discusses the doors in detail below.

1   Decl., Ex. 5.

2

3       **D.      The shooting**

4       There is also disagreement between the parties about where, when, and why defendant Les Galer

5   shot Mr. Mitchell.  At the coroner's inquest, defendant Les Galer testified as follows:

6           [After the security door opened,] I found myself being right in front of
         this door that's open, unarmed, and already knowing that I've been out here for
7        probably a minute now with somebody who's not going with the program.
             Needless to say, my adrenaline is up.  I enter into the room very
8        aggressively.  The No. 1 thing you're taught in the police academy, and the No.
         1 thing you're taught in any tactical environment, and the No. 1 thing I teach
9        new recruits at the police academy, if you don't want to go home at the end of
         your shift, go through a doorway slowly.  Or stand in it.
10

11  Marzan  Decl., Ex. C, 37:19–38:4.  All defendant Les Galer could see in the dark room was "the

12  shoulders and the head silhouette-ish of what [he] perceived to be an African-American male" who was

13  standing "towards the rear of the room."  *Id.* 41:13–41:20.

14          As I entered into the room, I met Mr. Mitchell in the middle of the room.  I do
         not recall yelling at Mr. Mitchell to get on the floor.  I don't have that conscious
15       memory at all.  Based on my training and experience and the number of search
         warrants and number of room entries I've been in, and the tactical experiences
16       that I have had in law enforcement, I'm almost certain that I did say something
         along the lines of get on the ground.  Show me your hands. . . .
17           At this point in time, I'm estimated somewhere between probably a foot,
         maybe 18 inches from Mr. Mitchell.  I have my firearm out in my right hand.
18       I would not describe it as "locked out" like this (indicating); I was only holding
         it with one hand.
19           At this point in time, I felt a grasp to the lower portion of my hand, right
         here, like this (indicating).  I – . . . .
20           My right wrist, holding my firearm (indicating).
             I gave a tug.  And simultaneously – which the best I can describe it
21       would be somewhat of a stiff arm, to gain separation. . . .
             As I pushed away from Mr. Mitchell to try to gain distance from him, I
22       pulled my firearm back into my upper shoulder area.  Fearing that he was – I
         was going to lose control of my firearm, and fearing for my life, I discharged
23       my firearm one time and I struck Mr. Mitchell.

24  *Id.* 42:10–42:18; 43:2–43:9; 43:11–43:15; 43:23–44:3.  At his deposition, defendant Les Galer clarified

25  that the command to get down is something that he would say "Upon seeing a suspect.  Upon seeing an

26  individual.  It's not a, it's not a command that coincides with merely walking through the door."

27  Marzan  Decl., Ex. B, 79:25–80:3.  He also clarified that he held the firearm "Out in front of me" and

28  " Pointed in the direction of where I was traveling," although he did not know "precisely" and "would

7

United States District Court
For the Northern District of California

say it was somewhere in the range of my torso." *Id.* 82:11–83:1. He did not have a "conscious recollection" of indexing his finger (putting it outside of the trigger wall on the rail of the gun rather than on the trigger) but is "certain" that he did because that is how he was trained "[t]o avoid pulling the trigger . . . when you're not trying to pull the trigger." *Id.* 97:6–98:20.

Defendant Phil Galer, Les Galer's identical twin brother, testified similarly.

> I brought up Les Galer – I watched Les – saw Les Galer go through the doorway. I was just about to enter that doorway when I heard a gunshot, a single gunshot.
> I continued through the doorway upon hearing the gunshot, and saw the back of Detective Les Galer standing approximately six to eight feet into the front room of the residence. And I observed an African-American male lying on his back at the feet of Detective Les Galer. . . .
> I grabbed his right shoulder and asked him hurriedly, "Are you shot?"
> He turned and said, "No, I'm not shot. He tried to grab my gun."

61:13–61:22; 62:3–62:6.

Plaintiffs' opposition to the summary judgment motions focused on defendant Lombardi's somewhat different testimony at the inquest:

> On the last time that I pulled it [the rake], the door came open. I ripped the door, you know, swinging outwards. Detective Dexter was outside. Detective Les Galer was kneeled at the front of the door, the doorjamb. I didn't see if the door was open or not at that time.
> So I dropped the pick, and I immediately went to arm myself. I'm left-handed, so I had the same drop type tactical holder that they were talking about. So I pulled my weapon out. Detective Les Galer was kneeling there. There is a little bit of a lag time because of where the second team members were stacked up.
> I started to flow with Les. His brother, Phil Galer, came almost simultaneously. I had my — because I am — I'm left-handed, I had my gun at the ready, kind of tucked, and I had my hand up on Phil's — or Les's right side.
> I felt him stop as we entered the room. And his right arm came back. And I'm trying to push, because, like he said, you got to get through that door because the fatal funnel type situation that we are encountering. So I am trying to push him through.
> So I hear a pop, the muzzle — the firearm going off. I didn't know if he got shot, somebody inside the room shot at us. It was pitch black in there, you couldn't see anything.
> I asked, and Phil was asking at the same time, "Are you hit? Are you shot?" And Les goes, "He tried to grab my gun."

Yourke Decl., Ex. 5, 71:17–72:21.

Defendant Lombardi has since disclaimed some of this testimony, explaining that he "would defer" to defendant Phil Galer's memory of entering the apartment second after defendant Les Galer, because defendants Phil Galer and Les Galer are identical twins and defendant Lombardi cannot tell

8

them apart.  Lombardi Decl. ¶ 10.  He also states that "push . . . does not mean to shove or exert force," but rather it "refers to th[e] technique of placing one's hand on the officer in front of him to determine which direction he or she is moving."  *Id.* ¶ 11.

Plaintiffs' expert, Mr. Clark, criticized many of the statements made by the defendant police officers.  For example, Mr. Clark stated that "'Push' is not a police term of art.  When Officer Lombardi testified at the inquest that he 'pushed' Officer [Les] Galer to get him through the door, he meant exactly what he said."  Clark Decl. ¶ 18.  In response to defendant Les Galer's statement that he would have shouted (and probably did shout) for Mr. Mitchell to get down only once he actually saw Mr. Mitchell, Clark states that defendant Les Galer "violated standard policies and procedures by failing to shout 'Get Down!' prior to making entry and thereby giving Mr. Mitchell sufficient warning to get out of the way because he, Galer was coming in."  *Id.* ¶ 19.  Clark also opined, based on defendant Les Galer's lack of specific memory of how he held the gun, that defendant Les Galer entered the room "with his firearm held in front of him at shoulder height and with his index finger on the trigger."  *Id.* ¶¶ 19, 23.  He stated that this, in combination with the tardy warning, "created a situation in which a dangerous collision between himself and Mr. Mitchell became practically inevitable."  *Id.*  Clark believes that defendant Les Galer "rushed through the door and into the apartment and then came to a sudden stop in the doorway when he was confronted with the subject who had just opened the front door pursuant to the police orders. [He] violated basic protocol by rushing in first when he was not supposed to do so and he created confusion and a collision with other squad members, especially officer Lombardi and possibly his brother."  *Id.* ¶ 22.  Clark also relies to some extent on the report of a biomechanics expert, Jesse Wobrock, that plaintiff is no longer relying on as an expert witness.  Clark concludes that "Officer Les Galer either (1) discharged his firearm accidentally due to his being pushed from behind by Officer Lombardi and also possibly colliding with Mr. Mitchell just inside the doorway, or (2) discharged his firearm intentionally out of extreme fear when he confronted Mr. Mitchell just inside the doorway."  *Id.* ¶ 14.  If Mr. Mitchell grabbed his wrist at all, it was "probably . . . to avoid being killed" and "instinctive[]."  *Id.* ¶ 24.

9

United States District Court
For the Northern District of California

**E.     The forensics**

The medical examiner found "fine punctate stippling" on Mr. Mitchell's body but not soot or other stippling, meaning that the barrel of the gun was located between six inches and two feet from his body when he was shot.  Josselson Decl. ¶¶ 3, Ex. A at C7.  The bullet had entered his neck on the right side and lodged in the left side of his torso approximately 27 inches from the top of his head.  *Id* ¶ 6.  Mr. Mitchell was approximately five feet eleven inches; defendant Les Galer was approximately six feet five inches.  Marzan Decl., Ex. C, 15:10; L. Galer Decl. ¶ 15.  The only other fresh injury that the examiner noted was an abrasion on Mr. Mitchell's right elbow.  Josselson Decl. & Ex. A.  Some amount of gunshot residue was found on both of Mr. Mitchell's hands.  Marzan Decl., Ex. G.

**II.     The January 26, 2011 Summary Judgment Order**

On January 26, 2011, the Court granted the summary judgment motions filed by the five officers.  In granting summary judgment, the Court analyzed both the reasonableness of the method of the execution of the search warrant and whether Les Galer employed excessive force in shooting Mitchell.[5]  Viewing the evidence in a light most favorable to plaintiff, the Court found the method of execution reasonable.  The Court noted the undisputed evidence that Mitchell was a drug dealer; that the police were aware of a short barrel shotgun inside of Mitchell's apartment; that Mitchell was aware that the police were attempting to gain entry to his residence in order to execute a search warrant; that Mitchell was evasive when asked to open his door; and that Mitchell shouted "you have the wrong address" over the sound of the rake used by police.  The Court found that defendants' tactics – using an armed group of police officers to force entry into an occupied residence at seven in the morning – was reasonable in light of that evidence.

Regarding the excessive force claim, the Court found the uncontroverted evidence, construed in a light most favorable to plaintiff, also warranted summary judgment in favor of defendants.  In particular, the Court noted the uncontroverted evidence that Mitchell grasped hold of the hand in which defendant Les Galer was holding his gun.  The Court stated that "[a]lthough plaintiffs' expert asserts

---

[5]     The Court noted that plaintiffs did not challenge the validity of the warrant or the consitutionality of conducting some search of Mr. Mitchell's residence.

that Mr. Mitchell may have grabbed defendant Les Galer's wrist instinctively to protect himself from the gun, plaintiffs have not presented any evidence that a reasonable police officer would be able to know why a person had grabbed his gun wrist or that a reasonable police officer would not respond to such an act through a use of lethal force." Jan. 26, 2011 Order at 16. The Court concluded that "there is strong, uncontested evidence in this case that Mr. Mitchell posed an immediate threat to the safety of the officers." *Id.*

Judgment was entered against plaintiffs, and they appealed. However, as noted above, while the appeal was pending in the Ninth Circuit, defendants Wielsch and Lombardi were arrested and indicted for various corruption-related offenses.

### III.     The Indictment and Plea Agreement

Norman Wielsch was arrested in February 2011, and Louis Lombardi was arrested in May 2011. The Second Amended Felony Complaint charged Wielsch, Lombardi, and two others, with a total of thirty-eight violations of the California Health and Safety Code and California Penal Code. *See* Indictment, Request for Judicial Notice (Doc. 154-1), Ex. A. Count three of the indictment charges a conspiracy between the four defendants and other unnamed coconspirators to violate sections 11379(a), 11378, 11360(a), and 11359 of the Health and Safety Code, and sections "503/504" and "459/460(b)" of the Penal Code. *Id.* at 3. The conspiracy is alleged to have occurred between June 1, 2008 and May 4, 2011. *Id.*

The indictment alleges 27 overt acts in furtherance of this conspiracy, related to obtaining and selling marijuana, Alprazolam (Xanax) pills, anabolic steroids, ephedrine, methamphetamine, Oxycontin, and Ecstasy pills. *Id.* at 3–5. It is alleged that, in May 2009, Wielsch, Lombardi, and one other conspirator met to "discuss[] how to make money in the marijuana business using a Contra Costa Narcotics Enforcement Task Force confidential informant known by Lewis [sic] Lombardi." *Id.* at 4–5 (overt act no. 23). It is alleged that Wielsch obtained methamphetamine from the Contra Costa County Sheriff's property room and marijuana from the Contra Costa County Narcotics Enforcement Task Force. *Id.* at 4 (overt acts nos. 16 & 19). It is alleged that Lombardi sold marijuana seized in a raid, and Ecstasy pills, to a confidential informant. *Id.* at 5 (overt acts nos. 25 & 26). In addition, Lombardi was

charged with felony embezzlement by an officer in violation of Penal Code section 504, for actions taken in August 2007. *Id.* at 20.

On January 26, 2012, Lombardi pleaded guilty to nine of the counts charged against him. Henkels Decl., Ex. D (Plea Agreement). In his plea agreement, Lombardi admitted that "[b]eginning in at least early 2008 and continuing through at least November 2010, under color of law, I developed and carried out a scheme to knowingly and willfully deprive persons in the State of California of their rights against unreasonable searches and seizures and their rights against deprivation of property without due process of law. Specifically, I planned to and did steal money and property during searches that I performed in my role as a law enforcement officer with CNET . . ." *Id.* at 5. Among other crimes, Lombardi admitted to stealing $1,000 during a search of the home of an individual on March 20, 2008, nine days after the shooting of Mr. Mitchell. *Id.* Lombardi also admitted to selling, along with Wielsch, two ounces of methamphethamine that he had purchased through a CNET confidential informant. *Id.* at 6. Lombardi was sentenced by Judge Saundra Armstrong to 36 months in prison. Defs.' Supp. Br., Dkt. 195, at 3.

The lead investigator in the criminal case against defendants Wielsch and Lombardi filed a declaration that his investigation did not reveal any evidence that defendants Phil Galer, Les Galer, or Dexter, had any involvement in, or knowledge of, any of the criminal actions for which defendants Wielsch and Lombardi were charged. Decl. of Daryl Jackson in Supp. of Def. Oppo., ¶¶ 1 & 2. Nor do any of the charges filed against defendants Wielsch and Lombardi arise out of the search and shooting that occurred in this case. *Id.* ¶ 4.

## IV.    Order Granting Relief From Final Judgment and Subsequent Discovery

On September 2, 2011, based on the new facts referenced in the indictment, and pursuant to Federal Rule of Civil Procedure 60(b), the Court granted relief from the final judgment entered in favor of defendants. Dkt. 158. The Court noted that in granting summary judgment in favor of the defendants, the Court relied in part on the deposition testimony and declarations of Wielsch and Lombardi, testimony which was given at the same time Wielsch and Lombardi were alleged to have engaged in criminal activity. *Id.* at 5. The Court also noted that plaintiffs were "never given the

United States District Court
For the Northern District of California

opportunity to examine defendants with regard to the facts that form the basis of the indictment against defendants Wielsch and Lombardi. Plaintiffs did not have the opportunity to investigate whether defendants Wielsch and Lombardi changed their stories or omitted information in order to escape increased scrutiny in this case, and to avoid any chance that such scrutiny would lead to the discovery of the conspiracy charged in the indictment." *Id.* The Court cautioned that "[t]his is not to say that the simple inclusion of these facts in plaintiffs' opposition to defendants' motions for summary judgment would have been sufficient to create a genuine issue of material fact. Rather, these new facts raise such substantial issues as to credibility and motive/bias that plaintiffs would have been entitled to take additional discovery before summary judgment could have been granted." *Id.* at 5-6.

## V.    Activity Since Re-Opening Case

Following the grant of relief, plaintiffs moved to compel disclosure of the identity of the confidential informant (the "CI") who provided the basis of the search warrant. Dkt. 163. Over defendant's objection, the Court granted that motion to compel. Jan. 11, 2012 Order re: Discovery (Dkt. 168). On April 17, 2012, the Court issued an order allowing plaintiffs to depose the CI. Dkt. 185. The Court also granted plaintiffs leave to re-depose Lombardi, re-depose Dexter if warranted based upon testimony of the CI, and obtain review of sealed records pertaining to a March 2008 interview with the CI. *Id.* at 2.

Plaintiffs deposed the CI on April 27, 2012. Dkt. 188 at 3. Lombardi, following entry of his guilty plea, was deposed on May 15, 2012. Dkt. 190 at 3.

On May 13, 2012, plaintiffs filed a "Supplemental Status Conference Statement" along with the Joint Case Management Statement that suggested plaintiffs have developed a new theory of the case: "Plaintiffs believe that CNET was an ongoing criminal conspiracy operating under color of law when Tim Mitchell was shot and killed and that the search of Mr. Mitchell's apartment was motivated by criminal intent, i.e., to steal drugs, cash and valuables. This conspiracy went far beyond Wielsch and Lombardi and included many other CNET agents. Plaintiffs intent to amend their complaint to state a claim under the federal RICO statute. Plaintiffs also intend to depose all persons who were victimized by CNET's home invasion robberies." Dkt. 189 at 1.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

On May 18, 2012, the Court held a joint Case Management Conference.  The Court requested that counsel advise the Court via briefing as to whether any new discovery has raised triable issues of material fact.  Dkt. Entry 191.  On June 22, 2012, defendants Les and Phil Galer, Dexter and Lombardi filed a motion to reinstate summary judgment, arguing that no new issues of material fact have been raised in discovery.  Defendant Wielsch separately moved for same.  Plaintiffs filed an opposition on July 9, 2012, and defendants replied on July 16, 2012.

After briefing the instant motions, plaintiffs also filed a number of letters with the Court. Plaintiffs object to defendants' filing of motions to reinstate summary judgment, arguing that the Court only requested briefing as to whether new issues of triable fact were raised, and did not authorize summary judgment motions.  Dkt. 216.  Plaintiffs also sent a letter requesting permission to file their own motion for summary judgment, or, in the alternative, leave to file a motion for reconsideration of the Court's January 26, 2011 Summary Judgment Order.  Plaintiffs argue that the Court made "several egregious mistakes" in that Order, particularly in a footnote which stated that Galer carried his firearm in the "low ready" position (pointed downward) at the time Mitchell grabbed his hand.  Dkt. 217 (*citing* Jan. 26, 2011 Summary Judgment Order, fn. 7).  Finally, plaintiffs filed an exhibit with the Court that they had inadvertantly failed to file with their opposition.  Dkt. 219.  On July 25, 2012, the Court issued an order admitting the exhibit.

## LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial.  The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case.  *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'"  *Id.* at 324 (quoting then-Fed. R. Civ. P. 56(e)).  To

14

carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)(2).

## DISCUSSION

In the Court's Order Granting Relief From Final Judgment, the Court noted that the criminal indictments of Lombardi and Wielsch "raise such substantial issues as to credibility and motive/bias that plaintiffs would have been entitled to take additional discovery before summary judgment could have been granted." Sept. 2, 2011 Order, Dkt. 158, at 5-6. Having vacated the January 26, 2011 Summary Judgment Order, the question before the Court is whether the indictments, the new discovery, or any other disputes of material fact warrant reinstatement or denial of summary judgment.

## I.    The New Discovery

Plaintiffs' primary discovery, with the assistance of orders from the Court, has been the deposition of the CI upon whose testimony Dexter's application for the search warrant was based, and the deposition of Lombardi. In their opposition, plaintiffs also attach declarations from two people unrelated to this case, which plaintiffs say tend to prove the existence of a CCCNET conspiracy that existed prior to the March 11, 2008 death of Mr. Mitchell. The new discovery is as follows.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

### A.    Discovery Related to the Confidential Informant

Dexter was the case agent (lead investigator) for the search warrant related to the search of Mitchell's apartment. Dexter Decl. ¶ 8. In the declaration Dexter provided in support of defendants' original summary judgment motion, Dexter stated that he was informed by a confidential informant (the "CI") that an African-American male named Tim was selling marijuana from the subject location; that the CI had personally observed Tim selling marijuana from that location; that Tim kept a shotgun at the subject location "by the front door"; and that Tim "had advised him that he would not hesitate to use it." Dexter Decl. ¶ 9. Dexter also declared that he believed the CI to be reliable. Dexter Decl. ¶ 10. Based on the CI's testimony, Dexter had prepared an affidavit in support of the search warrant, which he attached to his declaration. Dexter Decl., Ex. A (Search Warrant Affidavit). The affidavit describes the CI's statements regarding the marijuana, but does not mention the shotgun. Dexter Decl., Ex. B1 (Dkt. 92) at 6.

On January 11, 2012, following the re-opening of this case, the Court granted plaintiffs' motion to compel the disclosure of the CI. Jan. 11, 2012 Order re: Discovery (Dkt. 168). On April 17, 2012, the Court issued an order allowing plaintiffs to depose him. Dkt. 185. The CI was deposed on April 27, 2012. Edrington Decl., Ex. A (CI Dep.).

At his deposition, the CI testified that in February of 2008, he provided information regarding Mitchell to Dexter. CI Dep., 11:2-19. The CI testified that he informed Dexter that he had "witnessed selling and witnessed larger amounts of marijuana in [Mitchell's] apartment" as well as one shotgun he had "actually picked up [himself]." CI Dep. 12:1-4. The CI testified that he had spoken with Mitchell on multiple occasions about Mitchell's marijuana sales, and had been to Mitchell's home three or four times. CI Dep. 13:1-4, 13:20-22. Regarding the shotgun, the CI testified: "I remember going into detail that I thought it was a video game shotgun as I picked it up and was informed by Timothy that it was a real shotgun and I explained to him that it had extra shells on the side. I don't know the term for it, but, you know, the extra cartridges were on the side of it so I went into detail with him about what the shotgun looked like." CI Dep. 14:9-19. When asked if the CI recalled saying anything to Dexter about Mitchell being prepared to use the shotgun on anybody that came through the front door, the CI responded that he could not recall "that detail." CI Dept. 15:17.

United States District Court

For the Northern District of California

### B.    The Lombardi Plea Agreement

Lombardi entered into a plea agreement on January 26, 2012, exactly one year after the Court entered summary judgment in defendants' favor and four months after the Court re-opened the case. He pleaded guilty to four counts of deprivation of rights under color of law in violation of 18 U.S.C. § 242; one count of conspiracy to maintain drug-involved premises, in violation of 21 U.S.C. §§ 846 and 856(a)(1) and (b); two counts of possession with intent to distribute marijuana in violation of same; one count of possession with intent to distribute and distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(c); and one count of possession of a stolen firearm in violation of 18 U.S.C. § 922(j).  Henkels Decl., Ex. D (Lombardi Plea Agreement).

Regarding the deprivation of rights counts, Lombardi admitted that he committed thefts from searches from at least early 2008 through at least November 2010.  *Id.* at 5.  He admitted to stealing at least $40,000 in cash, as well as jewelry, narcotics, and other items.  *Id.*  His thefts occurred during searches of illicit massage parlors, during probation and parole searches, as well as during the execution of search warrants.  Regarding the latter, he admitted to stealing approximately $1,000 during a search of a home on March 20, 2008, nine days after the execution of the search warrant at Mitchell's home. He also admitted to stealing approximately $3,000 during execution of another search warrant in Pittsburg, California on November 13, 2008; stealing a bottle of whiskey during the search of a bar; and stealing $7,500 worth of jewelry during the search of a home on November 5, 2010.  *Id.*

With respect to Wielsch, Lombardi also admitted that he met with Wielsch and a private investigator, Chris Butler, to develop a plan to grow marijuana and sell it to one of Lombardi's contacts. Lombardi stated that in late 2009, after he left CCCNET, Wielsch gave Lombardi a half-pound of marijuana to sell.  *Id.* at 6.  Lombard sent the marijuana via UPS to his contact in Arizona, and received "partial payment" from the contact, which Lombardi gave to Wielsch.  *Id.*

The plea agreement makes no mention of Mitchell, Mitchell's home, or the events of March 11, 2008.

### C.    Lombardi's Deposition

The Lombardi deposition took place on May 15, 2012 and June 19, 2012.  Lombardi was given

United States District Court
For the Northern District of California

time to review his October 12, 2010 deposition testimony given prior to the original summary judgment motions (and prior to his indictment). When asked if he would like to change that testimony in any way, Lombardi answered no. Edrington Decl., Ex. B (Lombardi Dep. 8:3-10). Lombardi also responded that the earlier deposition testimony was entirely truthful. *Id.*

Lombardi then testified that he began to steal money and property during searches in late 2007 or early 2008. Lombardi Dep. 14:24-15:3. He testified that the thefts were "crimes of opportunity," and not a plan developed in conjunction with any other officers. Lombardi Dep. 15:11-15. He stated that while other team members may have been present during the searches, they were not in a position to see him taking the cash, that he did not tell them he was doing so, and that he did not share the cash with any of the others. Lombardi Dep. 17:14-23. He specifically testified that Wielsch was not aware of the "theft-type crimes" he was committing while a CCCNET agent. Lombardi Dep. 35:24-36:4.

Regarding the search of Mitchell's residence, Lombardi testified that he did not have any intention of stealing from Mitchell's home, nor did he actually steal anything. Lombardi Dep. 40:1-20. He also explained that Dexter was the lead agent, that Dexter "found the suspect. He conducted all the investigations. He wrote the search warrant. He wrote the operation plan. He briefed us on the operation plan." Lombardi Dep. 42:4-7. He testified that neither Dexter nor the Galer brothers were aware of the criminal activity he was involved in. Lombardi Dep. 42:21-43:10.

Lombardi stated that he left CCCNET in March 2009 and that any crimes he committed following that date were not in connection with his work as a CCCNET agent. Lombardi Dep. 27:10-14. Lombardi was also asked about his knowledge of Wielsch's criminal activity. He testified that he never observed Wielsch commit any criminal activity while at CCCNET, and that none of the counts Lombardi pleaded to with respect to the CCCNET crimes involved Wielsch. Lombardi Dep. Vol. II, 21:24-22:11. Lombardi testified that his personal knowledge of criminal activities involving Wielsch included the incident following Lombardi's departure from CCCNET in which Wielsch provided Lombardi with a half pound of marijuana, which Lombardi sold to his contact in Arizona and gave the proceeds to Wielsch in exchange for a watch; an occasion in May 2010 in which Wielsch provided Lombardi with 2 ounces of methamphetamine; and the conspiracy to grow marijuana, which never came to fruition. Lombardi Dep., Vol. II. 28:17-29:25.

United States District Court
For the Northern District of California

1    Plaintiffs focus the Court's attention on the watch given by Wielsch to Lombardi as partial

2    payment for Lombardi's assistance in arranging the sale of the half pound of marijuana.  Lombardi

3    testified that he was aware the watch was stolen from a house in Brentwood, CA during a search in

4    which Wielsch was present.  Lombardi Dep. Vol. II, 31:13-22.  Plaintiffs contend that this watch was

5    stolen by Wielsch during a raid of a home on October 1, 2008 in which an unrelated party, Jennifer

6    Curtis, was present.  Plaintiffs attach a declaration of Jennifer Curtis.

7

8    **D.      Declaration of Jennifer Curtis**

9    Jennifer Curtis is an individual who is currently suing both Wielsch and Lombardi, among

10   others, for conducting illegal searches of her home and stealing her property, including her watch.  *See*

11   *O'Toole v. City of Antioch*, 11-1502 PJH (N.D. Cal. 2012).[6]  In her declaration, Curtis states that on June

12   28, 2007, CCCNET executed a search warrant at her boyfriend's Brentwood house in which she resided,

13   and stole $14,000.  Curtis Decl. ¶ 4.  Curtis further alleges that on October 1, 2008, her home was again

14   "raided," this time by Wielsch, Lombardi and others, following which multiple pieces of jewelry,

15   including a Swiss "ICE" watch, went missing.  Curtis Decl. ¶¶ 8-13.  She states that on May 25, 2011,

16   following Lombardi's arrest, she was invited to the San Ramon Police Department to identify a

17   wristwatch.  Curtis Decl. ¶ 17.  She states that she positively identified the watch as her Swiss "ICE"

18   watch that was stolen by officers during the October 1, 2008 raid.  *Id.*

19   Plaintiffs argue that Curtis' declaration, coupled with Lombardi's testimony that Wielsch gave

20   him the watch, "tends to prove that Wielsch was engaged in stealing cash and valuables from suspected

21   drug dealers in 2008 (the year in which Tim Mitchell was killed) and was doing so while executing

22   search warrants as the Commander of CNET.  The fact that Jennifer Curtis' watch was recovered from

23   Lombardi after he was arrested also tends to enhance her credibility when she claims that on June 28,

24   2007 – nine months before the Mitchell shooting – CNET stole around $12,000 in cash from a safe

25   during a raid on the house."  Pls.' Opp. to Defs.' Mot. to Reinstate SJ at 10.

26   _____

27        [6]      The case is currently stayed because two of the plaintiffs, including Curtis, are currently
     under felony indictment for possession of marijuana while armed with a handgun.  *See* 11-1502 PJH,
28   Dkts. 39 and 42.

### E. Declaration of Eric Parker

Finally, plaintiffs attach a declaration from a prisoner named Eric Parker. Yourke Decl., Ex. A. The declaration was not created for this litigation; it is addressed to, *inter alia*, Magistrate Judge Cousins and U.S. Attorney Melinda Haag. Parker alleges that "the criminal misconduct of the agents of CNET while under the command of Mr. Weilsch [sic] and acting under color of the States authority, were clearly under way prior to my arrest and conviction in 2004, because, prior to my arrest, I was one of the victims of their corrupt actions and utter disrespect for the laws and their enforcement." Parker Decl. ¶ 4. Parker states that CNET conducted multiple raids on his house, stealing cash, camera equipment and jewelry, but "they never identified themselves as CNET agents" and "always wore black ski masks so they could not be identified." Parker Decl. ¶ 11.

Plaintiffs argue that Parker's declaration "provides evidence that both Commander Norman Wielsch and his CNET crew were engaged in the practice of stealing from suspected drug dealers in 2004, long before Tim Mitchell was killed." Pl.'s Opp. at 7.

## II. Analysis of the New Discovery

### A. Disclosure and Deposition of the CI

The existence and testimony of the CI effectively confirmed Dexter's probable cause statement in support of the search warrant, as well as his declaration to this Court in support of summary judgment. The CI confirmed that he spoke with Dexter about Mitchell; that he told Dexter that Mitchell possessed and sold marijuana; and that Mitchell had a shotgun in his apartment. While there is some ambiguity as to whether the CI actually informed Dexter that Mitchell had stated he "would not hesitate to use" the shotgun, the Court did not rely on (or even mention) that hearsay statement in the January 26, 2011 Summary Judgment Order.

### B. Lombardi's Deposition; the Curtis and Parker Declarations

Plaintiffs' new theory is essentially that the evidence they have provided – Lombardi's deposition testimony, and the Cutis and Parker declarations – tend to prove that Lombardi or Wielsch intended to commit a theft at Tim Mitchell's apartment, and thus the search was motivated by "criminal

20

intent." Pl.'s Opp. at 12. Plaintiffs also argue that they "can present evidence that Wielsch and Lombardi did not act in isolation but rather acted with the full knowledge and cooperation of each other and the rest of the CNET squad." *Id.* at 5.

The Court disagrees that the new discovery tends to prove Wielsch or Lombardi intended to steal from Mitchell's apartment. Parker's and Curtis's allegations are completely unrelated to the events at Mitchell's apartment. Lombardi's guilty plea did not touch on any activity that occurred at Mitchell's apartment. Lombardi's deposition testimony was that he did not intend to nor did steal from Mitchell's apartment, and emphasized that he worked alone and that none of the other officers involved in the Mitchell search were aware of his criminal activity.

It appears plaintiffs intend to prove that the search was not based on probable cause that a crime was being committed; that instead, the search was based on Wielsch and Lombardi's desire to rob Mitchell. However, that theory is undermined by the actual warrant and Dexter's supporting affidavit, as well as the CI's deposition testimony, all of which clearly demonstrate that there was probable cause to conduct the search. Indeed, up until now, plaintiffs did not challenge the validity of the warrant or the constitutionality of conducting *some* search of Mitchell's residence. *See* Summ. J. Order at 11. n. 6. Moreover, it was Dexter, not Wielsch or Lombardi, who led the investigation and developed the operational plan to search Mitchell's apartment. The lead investigator into Wielsch and Lombardi's criminal activities filed a declaration with the Court stating that his investigation has not revealed any evidence that Phil Galer, Les Galer, or Sean Dexter "had any involvement in, or knowledge of, any of the criminal actions for which Wielsch and Lombardi have been charged." Jackson Decl. (Dkt. 153-2), ¶ 2. In ruling on a summary judgment motion, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The provision of declarations from two parties unconnected to this litigation complaining about Wielsch and CCCNET in unrelated incidents constitutes barely a scintilla of evidence with respect to Wielsch's and Lombardi's intent on the morning of March 11, 2008.

Nor have Plaintiffs provided any evidence that the other CCCNET officers were ever involved in Lombardi's and Wielsch's criminal activity, let alone on the morning in question. As noted, the

months-long investigation of CCCNET, which was conducted with the assistance of the FBI and the US Attorneys' Office, found no evidence that Dexter or the Galer brothers were involved in, or even had knowledge of, Wielsch's and Lombardi's criminal activity. Jackson Decl. ¶ 2. The investigation also found no evidence that "any action taken by CNET detectives in planning and attempting service of a search warrant on Timothy Mitchell and his residence on March 11, 2008, including the discharge of Sgt. Les Galer's weapon at Mr. Mitchell, was in any way unlawful." *Id.* at ¶ 3.

Finally, it is unclear whether, if plaintiffs could establish that two of the officers in the team intended to steal from Mitchell, it would alter the Fourth Amendment analysis -- an analysis that focuses on the objective nature of the officers' actions, not the subjective intentions of the officers involved. *See Whren v. U.S.,* 517 U.S. 806, 813 (1996) ("Subjective intent alone . . . does not make otherwise lawful conduct illegal or unconstiutional"); *Graham v. Connnor*, 490 U.S. 386, 397 (1989) ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").

In sum, plaintiffs have not shown a genuine issue of fact exists with respect to any of the officers having a "criminal intent" on the morning of the search of Mitchell's apartment. At oral argument and in their papers, plaintiffs request the Court's assistance in pursuing their theory of criminal intent and conspiracy, through subpoenas to the FBI and other government agencies, as well as through a deposition of Wielsch's alleged co-conspirator, private investigator Chris Butler. The Court denies that request. While the Court finds below that summary judgment is not warranted at this time, the Court finds that further discovery in pursuit of this theory is unsupported by the facts and irrelevant. The Court does not intend to grant any motions to compel or otherwise assist in discovery in furtherance of this theory.[7]

---

[7]      The U.S. Attorneys' Office has moved to quash plaintiffs' recent subpoena seeking "all documents including investigative reports and witness statements relating to any allegations of criminal wrongdoing by CNET Commander Normal Wielsch, CNET Agent Louis Lombardi and any other CNET agents, from 2001 through 2009." See Dkt. 232. The subpoena was served on the US Attorneys' Office and the FBI. *Id.* The Court GRANTS the motion to quash on grounds of irrelevance. *See* 28 C.F.R. §§ 16.22 *et seq.*; *Touhy v. Ragen*, 340 U.S. 462 (1951).

1   **III.    Review of the Jan. 26, 2011 Summary Judgment Order**

2       **A.      Fourth Amendment Claim**

3           In light of the indictments and the Court's September 9, 2011 vacation of the Summary

4   Judgment Order, the Court believes a review of the facts and its own prior analysis is warranted.

5   Plaintiffs' first cause of action is brought pursuant to § 1983 for violation of Mitchell's Fourth

6   Amendment rights, because "the manner in which Defendants and each of them attempted to execute

7   the search warrant was unreasonable and created a grave and unnecessary danger to Decedent, and

8   proximately caused Decedent's death." TAC ¶ 42.

9           "[T]he method of an officer's entry into a dwelling [is] among the factors to be considered in

10  assessing the reasonableness of a search or seizure." *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995).

11  This is so even where the police have obtained a valid search warrant. *See id.* at 929.  The police must

12  "strike[] the appropriate balance between the legitimate law enforcement concerns at issue in the

13  execution of search warrants and the individual privacy interests affected by" the execution. *Richards*

14  *v. Wisconsin*, 520 U.S. 385, 394 (1997).  For example, "[i]n order to justify a 'no-knock' entry, the

15  police must have a reasonable suspicion that knocking and announcing their presence, under the

16  particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation

17  of the crime by, for example, allowing the destruction of evidence." *Id.*  If the police do knock and

18  announce their presence, they may still force their way into a residence if the "totality of circumstances

19  in a given case" make such forced entry reasonable, because "there is no reason to treat a post-knock

20  exigency differently from the no-knock counterpart." *United States v. Banks*, 540 U.S. 31, 36, 40

21  (2003); *see also id.* at 39–40 (holding that the 15 to 20 second pause before forcing entry was reasonable

22  based on considerations of destruction of drug evidence, without regard to how long it would have taken

23  the occupant to answer the door); *id.* at 42 (explaining that an officer may also force entry "if, after

24  notice of his authority and purpose, he is refused admittance.").  However, "The lawfulness of the

25  [entry] team's original plan is not relevant to [the Court's] consideration; [the Court's] role is to evaluate

26  the events as they actually transpired." *United States. v. Peterson*, 353 F.3d 1045, 1051 (9th Cir. 2003).

27          Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth

28  Amendment as enunciated in *Graham v. Connor*, 490 U.S. 386, 399 (1989), and *Tennessee v. Garner*,

471 U.S. 1 (1985). Determining whether the force used was reasonable requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham*, 490 U.S. at 396. The test of reasonableness requires careful attention to the facts and circumstances of each particular case, including: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396.

As discussed in the Summary Judgment Order, with respect to the Fourth Amendment claims, the question before the Court is essentially twofold – whether the method of execution of the search warrant was unreasonable, and whether Les Galer used excessive force in shooting Mitchell. While plaintiffs attempted to raise a number of specific issues of material fact to survive summary judgment, the three general theories of constitutional violation relied on by plaintiffs amounted to attacks on (1) the decision to use a "tactical entry" at seven in the morning to search the apartment of a marijuana dealer; (2) Les Galer's method of entry into the apartment, particularly after the element of surprise had been lost by the more-than-a-minute delay in opening the screen door; and (3) Les Galer's shooting of Mitchell.

### 1. The Use of Tactical Entry[8]

At summary judgment, plaintiffs and their expert argued that the use of an armed group of police officers to force entry into an occupied residence at seven in the morning to execute a search warrant for evidence of marijuana transactions was dangerous and unnecessary and therefore did not "strike[] the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by" the execution. Pl.'s Opp. to Def.'s Mots. For Summ. J. at 20; *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). Instead, plaintiffs argued, the officers could have asked the apartment manager to let them in with a key after showing him the search warrant; they could have waited until the subject was not at home to search the apartment; or they

---

[8] The parties explain that "tactical entry" means the forcible entry by police into a residence with people inside. Pl.'s Opp. to Summ. J. at 4.

United States District Court
For the Northern District of California

could have picked the subject up on the street and detained him while they searched the apartment. *Id.* at 21.

As the Court noted in the summary judgment order, the Constitution does not require officers to "ascertain the least intrusive alternative (an inherently subjective determination) and choose that option and that option only." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *see also Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002) ("Even though officers might have had less intrusive alternative available to them . . . police officers need not avail themselves of the least intrusive means of responding and need only act within that range of conduct we identify as reasonable."). In finding the officers' decision to use a tactical entry reasonable, the Court's analysis then – and now – largely came down to a simple, uncontroverted fact: Timothy Mitchell possessed a short-barrel shotgun in his apartment. The Operational Plan developed prior to execution of the warrant states, in bold, "[t]here is a security screen on the door . . . **There is at least one short barreled shotgun on location."** Dexter Decl., Ex. B (Operational Plan).[9] The presence of the shotgun greatly amplified the risk of danger to the police and justified the plan to use armed entry at seven in the morning. Even if tactical entry was not the best or safest method of entry, the presence of the shotgun rendered it reasonable, which is all that is required by the Constitution.

While it is true that the now-indicted Wielsch approved the plan to use a tactical entry, there is no evidence that the decision was improper or motivated by criminal intent. Moreover, Dexter was the case agent and developed the operation plan. Dexter Decl. (Dkt. 91) ¶ 16. Wielsch's role as commander in approving the use of tactical entry does not alter the Court's conclusion that the method of entry was reasonable.

### 2.    Les Galer's Entry Into the Apartment

When the officers reached Mitchell's apartment, they arranged themselves outside of Mitchell's security screen door as follows: Dexter on the right side of the door, Lombardi mid-door, and Les Galer just to the left of the door. L. Galer Decl. (Dkt. 86) ¶ 20. The security door opened outward from the

---

[9]    An illegal, loaded Remington sawed-off shotgun was found during the search. P. Galer Decl. (Dkt. 84), ¶ 17.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

left side, with the hinges on the right.  Five other officers, including defendant Phil Galer and defendant Wielsch, remained to the left of Les Galer.  Marzan Decl. Ex. B 52:22-53:3.  Wielsch testified that he was "seventh in the stack – between Detective Zuniga of Pittsburg P.D. and Antioch Patrol Officer Bedgood."  Wielsch Decl. ¶ 19.  At approximately 7:00 a.m., Dexter made the knock and announce, pounding on the wall and yelling "Police; search warrant; come to your door."  Galer Decl. ¶ 21; Dexter Decl. ¶ 23.  He said this three or four times.  L. Galer Dep. 54:22-25.  Dexter testified that after the second announcement, he heard a male voice from inside the apartment say "Hang on."  Dexter Decl. ¶ 22.  Dexter repeated the announcement; after some delay, Dexter heard the same male voice say, "You got the wrong place."  Dexter Decl. ¶ 22.  Les Galer also testified that he heard "a male voice inside the apartment yelling, 'You have the wrong house,' two or three times."  L. Galer Decl. ¶ 22.  Dexter then told Lombardi to open the door with the pick.  Dexter Decl. ¶ 23.  Lombardi then attempted to open the security door, but had some difficulty on his first few tries.  Dexter Decl. ¶ 23.  After approximately one minute, the security door opened; however, the parties disagree as to whether Lombardi opened the door, or Mitchell opened the door himself.  Lombardi Decl. ¶¶ 9-10; Clark Decl. ¶ 17.  Once the security door was open, Les Galer noticed the inner front door to the apartment was slightly ajar, approximately two to three inches.  L. Galer Decl. ¶ 25.  Les Galer did not know how the front door came to be open.  *Id.*  Galer made the decision to enter the premises.  L. Galer Decl. ¶ 26.

Les Galer's testimony about his actions once the door opened is as follows.  He was kneeling at the door jamb to the left of the door during that time with the ram.  Galer Decl. ¶ 25.  Once the security door was opened, Galer "felt vulnerable in [his] position near the front door as [he] was not armed and because the suspect may have armed himself with a shotgun."  Galer Decl. ¶ 26.  Galer recounted:

> Based on my training and experience, I made the decision to enter the premises first.  I wanted to get out of the 'fatal funnel' once I saw that the front door was ajar, so as to get all of the officers into the room safely and serve the search warrant . . .
>
> I immediately dropped the ram and removed my service revolver from its holster with my right hand.  I pushed the door open with my left hand.  The door opened inward to the east (to the right).  I then made tactical entry into the room aggressively, in a controlled, smooth and deliberate fashion, based upon my training and experience.  Upon entry, I moved in a western direction to the left, the result of which would have been to draw the attention of the subject to myself

and away from other officers following through th door.  Although it was fairly dark inside, I could see the silhouette of an African-American male standing towards the middle or rear of the living room.

. . .

As I moved through the apartment, I saw the subject moving towards me.  We were coming towards each other.  I had my firearm in my right hand out in front of me pointed in the direction I was moving.  I suddenly felt the subject grab a hold of my right hand/wrist.  I felt a sense of immense urgency to retain my pistol and gain some distance between myself and the subject.  I extended my left hand towards the subject's right shoulder.  Simultaneously, I pulled my firearm in my right hand back and upwards towards my right shoulder in a position of retention with the muzzle of my gun pointed in a downward angle towards the subject's body.

As I pulled my right hand back, the subject continued to hold onto my right hand/wrist.  Fearing that I was losing control, I discharged the firearm.

Galer Decl. ¶¶ 28-32.

Plaintiffs argue that Galer's recounting of the facts is inconsistent with the evidence.  In particular, plaintiffs' expert states that in his opinion, Mitchell had complied with the police order to open the doors when he was shot.  He states that:

Physical evidence demonstrates that [Mitchell] had opened both the outer security screen door and the inner front door and neither of the doors was forcibly breached by Officer Lombardi.  This is proven y [sic] the fact that the doors do not show any visible signs of damage consistent with being forced open with a "pick" (pry tool used by police to open security doors).  The photographs taken by the police technician on the date of the incident show no signs of damage to the frame of the outer security door.  The only visible damage to the screen door consists in [sic] a number of holes in the screen and a bent support rod on the front of the door.  This minor damage is consistent with Officer Lombardi's use of the pick in an attempt to force the door open.  However, if the door had been forced open, we would expect to see that the door frame had been severely damaged and it is not.  The door frame is clearly undamaged.  Nor is there any visible damage to the inner front door.  If Officer Lombardi had forced the inner door open which [sic] pick, then there would undoubtedly been visible damage to the front door.  There is none.  Also, the plaintiffs have testified that they examined the doors when they visited the apartment the day after the shooting and that both doors worked perfectly.  They opened, closed and locked.  The lack of damage to either door, the lack of damage to the door frame, and the location of the body on the floor a couple feet inside the doorway proves that Mr. Mitchell had opened the doors from within in compliance with the police orders and that neither door was forcibly breached by the police.  Officer Lombardi's testimony that he forced the outer door open is false.

Clark Decl. ¶ 17.  Consistent with Clark's statements, photos of the outer security door show punctures in the mesh screen, but no damage to the exterior frame.  Yourke Decl., Ex. 5 (Photos).  The door has both a deadbolt and a doorknob locking mechanism; neither appears damaged.  *Id.*  The police post-

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

incident report notes "some damage to the framework of the metal security door consisting of both apparent impact and pry marks, which appear to be fresh," but this appears to be referring only to the front of the door, not the exterior frame and doorknob/locking mechanism. Yourke Decl., Ex. 6 (Incident Report). The report further notes that "the metal clad interior door appeared to be undamaged and the locking mechanisms functioned normally." *Id.*

Plaintiffs' expert also contends that Les Galer failed to shout "Get Down!" prior to making entry, in violation of standard police policies and procedures. Clark Decl. ¶ 19. Les Galer testified that, "I do not have a recollection of saying anything to the subject as I entered the room. Based on all of my training and experience, however, I would have given commands for the subject to show his hands and get on the ground. That was, and is, my custom and practice." L. Galer Decl. ¶ 30.

In the Jan. 26, 2011 Summary Judgment Order, the Court largely discounted Clark's expert report with respect to the entry. The Court observed that Clark hadn't actually examined the door, or addressed the amount of damage that would have been done to the door if it had been forced open without being bolted. *See* Jan. 26, 2012 Summ. J. Order at 6. The Court noted that "he bases his opinion on photographs taken by the police and on alleged statements by plaintiffs that they examined the doors when they visited the apartment the day after the shooting and that both doors worked perfectly. (Plaintiffs have not submitted direct evidence that plaintiffs did examine the doors or what they perceived.)" *Id.* However, plaintiffs have since informed the Court that the door was disposed of immediately following the incident, and therefore Clark did not have the opportunity to inspect it. *See* Pl.'s Letter, July 22, 2012, Dkt. 217. Instead, the Court effectively accepted Lombardi's testimony that he, rather than Mitchell, had opened the door. *See* Lombardi Decl. ¶¶ 7-9; ("After several strikes with the snatch, the metal security door opened; approximately one minute or more had elapsed . . . After I opened the metal security door, I proceeded to pull out my weapon."); L. Galer Decl. ¶ 25 ("Det. Lombardi was able to get the metal security door open.").

However, the subsequent indictments of Lombardi and Wielsch have highlighted the extent to which the testimony regarding the door requires a credibility determination. The Court incorrectly credited Lombardi's (and Les Galer's) testimony that he, rather than Mitchell, had opened the door. The Court discredited Clark's testimony, though he did not have the opportunity to inspect the door. Clark

United States District Court
For the Northern District of California

1    was entitled to rely on the police photos.  Courts have long recognized that summary judgment is

2    inappropriate where credibility is at issue.  *S.E.C. v. Koracorp Indus., Inc.,* 575 F.2d 692, 699 (9th Cir.

3    1978).  Whether the door was opened by Mitchell or Lombardi is an issue of fact that turns on the

4    officers', and Clark's, credibility.

5         The question remains whether it is an issue of *material* fact.  That is, taking as true plaintiffs'

6    contention that Mitchell opened the door, does that alter the analysis of whether Les Galer's subsequent

7    actions constituted an unreasonable seizure?  The Court believes that it does.  If Mitchell had, in fact,

8    opened the door on his own, it calls into question the reasonableness of Galer's dropping the ram,

9    raising his firearm, and entering the room aggressively and with gun pointed in the direction he was

10   moving, particularly if failed to yell "Get Down!"[10]  Taking the facts in a light most favorable to

11   plaintiffs, these actions would constitute a violation of Mitchell's rights against unreasonable seizure.

12   Had Mitchell opened the door, it would also call into question Galer's testimony that Mitchell "mov[ed]

13   towards" him inside the apartment.  L. Galer Decl. ¶ 31.  The fact Mitchell opened the door would

14   instead support Clark's theory that Mitchell was standing just inside the door, and that "it is likely that

15   Galer confronted or collided Mr. Mitchell [sic] and that his firearm was pointed right at Mr. Mitchell's

16   head or chest at very close range."  Clark Decl. ¶ 24.  Because Mitchell would be very near the door had

17   he opened it himself, it could be objectively unreasonable for Galer to aggressively enter with his gun

18   pointed out in front of him before Mitchell had a chance to get out of the way, particularly if Galer failed

19   to inform Mitchell to get down.  *See* Clark Decl. ¶ 19.  Beyond the unnecessary use of force, doing so

20   would place Mitchell at risk of a fatal collision.  The Court therefore finds that whether Mitchell opened

21   the door is a question of material fact.

22        The criminal indictments of two of the key officers in the search of Mitchell's apartment have

23   served as a reminder that excessive force and reasonableness inquiries "nearly always require a jury to

24   sift through disputed factual contentions, and to draw inferences therefrom."  *Smith v. City of Hemet,*

25

26          [10]    The Court erred in a footnote in the Summary Judgment Order, in which the Court wrote
     that Les Galer "presented evidence that his finger was 'indexed' (held straight next to the trigger) and
27   that his gun was at 'low ready' (pointed down) at the time Mr. Mitchell first grabbed hold of his hand."
     Summary Judgment Order at 13.  In fact, Galer testified that his firearm was out in front of him,
28   "pointed in the direction [he] was moving."  Galer Decl. ¶ 31.

394 F.3d 689, 701 (9th Cir. 2005).

### 3.     The Shooting

The Court need not address whether the actual shooting of Mitchell constituted excessive force, because even  if pulling the trigger was reasonable, defendants could still be held liable if the method of entry was a violation of Mitchell's Fourth Amendment rights.  As the Ninth Circuit has explained, "if the police committed an independent Fourth Amendment violation by using unreasonable force to enter the house, then they could be held liable for shooting the man – even though they reasonably shot him at the moment of the shooting – because they used excessive force in creating the situation which caused [the man] to take the actions he did." *Billington*, 292 F.3d at 1188 (*citing Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1366 (9th Cir. 1994)).  The issue of excessive force related to the actual shooting is suited for a jury as well, depending on the outcome of the immunity determination.

### B.     Qualified Immunity

At summary judgment, defendants argued that they were entitled to qualified immunity.  The Court did not reach this question because it found that defendants were entitled to summary judgment on the claim for violation of Mitchell's Fourth Amendment rights.

The threshold inquiry in a qualified immunity analysis is whether the plaintiffs' allegations, if true, establish a constitutional violation. *Wilkins v. City of Oakland*, 350 F.3d 949 (9th Cir. 2003) (*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The Court has already found that taking all of plaintiffs' allegations as true, Les Galer violated Mitchell's constitutional rights against unreasonable seizure.  The Court therefore proceeds to the second step of the analysis, where the Court must determine whether the actions alleged violate a *clearly established* constitutional right. *Id.* "Clearly established means that it would be clear to a reasonable officer that his conduct was unlawful in the situation he created." *Id.*  In other words, "for a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Boyd v. Benton County*, 374 F.3d 773, 780-81 (9th Cir. 2004) (*citing Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

United States District Court

For the Northern District of California

1    Because the Court did not reach this question, the parties did not brief the issue of qualified

2    immunity in the motions to reinstate summary judgment.  Nor did the original summary judgment

3    motions focus on qualified immunity with respect to the precise constitutional violation at issue.  The

4    Court now requests additional briefing on the question of whether, taking plaintiffs' version of the facts

5    as true, Les Galer violated Mitchell's clearly established constitutional rights.  *See LaLonde v. County*

6    *of Riverside*, 204 F.3d 947, n. 10 (9th Cir. 2000)  (reversing district court's grant of summary judgment

7    because it "should have determined whether the officers were entitled to qualified immunity as a matter

8    of law on the basis of undisputed facts and, where material facts were disputed, on the plaintiff's version

9    of events.").  The question before the parties is whether it has been clearly established that an officer

10   may not constitutionally enter a home aggressively and with his gun pointed out in front of him, without

11   telling the resident to get down or otherwise move, when the resident has complied with an officer's

12   request to open the door.

13   The Court notes that the inquiry begins with binding precedent.  *Boyd,* 374 F.3d at 781.

14   However, even if there is no binding precedent on the question, a court can consider whatever decisional

15   law is available, including the decisions of state courts, other circuit courts, district courts and even

16   unpublished district court decisions.  *Drummond ex. rel. Drummond v. City of Anaheim*, 343 F.3d 1052,

17   1060 (9th Cir. 2003).  Moreover, the Supreme Court has "made clear that officials can still be on notice

18   that their conduct violates established law even in novel factual circumstances."  *Mattos v. Agarano*,

19   661 F.3d 433, 442-43 (9th Cir. 2011) (*citing Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

20   The Court sets a briefing schedule on this question below.

21

22   **C.    Integral Participation**

23    Defendants Phil Galer, Lombardi and Wielsch argue that they were not "integral participants"

24   in the shooting and thus cannot be held liable for Les Galer's actions.  In *Chuman v. Wright*, 76 F.3d

25   292, 293 (9th Cir. 1996), the Ninth Circuit rejected a "team effort" theory of liability for a team of

26   officers, and required "integral participation" by each officer as a predicate to liability.  *Id.*  The concern

27   was that "a mere bystander" who had "no role in the unlawful conduct" may nonetheless face liability.

28   In *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004), the Ninth Circuit clarified that "integral

1  participation does not require that each officer's actions themselves rise to the level of a constitutional

2  violation." *Id.* (holding that every officer who provided armed backup for another officer who

3  unconstitutionally deployed a flash-bang device to gain entry to a suspect's home could be held liable

4  for that use of excessive force because "every officer participated in some meaningful way" in the arrest

5  and "every officer was aware of the decision to use the flash-bang, did not object to it, and participated

6  in the search operation knowing the flashbang was to be deployed"); *see also Melear v. Spears*, 862

7  F. 2d 1177 (5th Cir. 1989) (holding that an officer who does not enter an apartment, but stands at the

8  door, armed with his gun, while other officers conduct the search, can nevertheless be a "full, active

9  participant" in the search).  Integral participation only requires "some fundamental involvement in the

10 conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481, n. 12

11 (9th Cir. 2007).

12     Here, Phil Galer, Dexter, Lombardi and Wielsch were all fundamentally involved in the conduct

13 that allegedly caused the Fourth Amendment violation.  Defendants' argument that they were not

14 integrally involved is premised on the Court's finding that the shooting was the constitution violation;

15 however, as set forth above, the violation may have occurred earlier by the method of entry into the

16 apartment.  *See* Def.'s Mot. for Summ. J. at 19; Wielsch Mot. for Reinstatement of Summ J. at 11.  All

17 four defendants  provided armed support for Les Galer's entry.  *See Boyd*, 374 F.3d at 780.  Moreover,

18 Dexter and Wielsch designed the operational plan.  While the Court found that the operational plan was

19 not itself a constitutional violation, Dexter's and Wielsch's involvement in its creation adds to the

20 indicia of evidence regarding their involvement in Les Galer's conduct.  Phil Galer and Lombardi

21 directly followed Les Galer into the apartment.  Lombardi may have opened the door, and  may have

22 even pushed Les Galer into the apartment, as he initially testified at the coroner's inquest.  Yourke

23 Decl., Ex. 5 (Lombardi Dep.), 71:17–72:21. All four were sufficiently involved to merit "integral

24 participant" status as defined by the Ninth Circuit.

25

26     **D.     Fourteenth Amendment Claim**

27     In the Jan. 26, 2011 Summary Judgment Order, the Court also granted summary judgment in

28 favor of defendants on plaintiffs' second claim for violation of the parents' Fourteenth Amendment due

process "right to enjoy family relations with their son and to enjoy his companionship and society." *See* Summ. J. Order at 17; TAC ¶¶ 43-44.  The Fourteenth Amendment inquiry is distinct from a Fourth Amendment excessive force claim.  *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).  Under the Fourteenth Amendment, "only official conduct that 'shocks the conscience' is cognizable as a due process violation."  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  "In determining whether deliberate indifference is sufficient to shock the conscience, or whether the more demanding standard of purpose to harm is required, the critical consideration [is] whether the circumstances are such that actual deliberation is practical." *Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009).

The Court found that none of the acts leading up to the shooting – including the failure to verify Mitchell's criminal history and the method of execution of the warrant – supported a finding that the defendants were deliberately indifferent to the danger that their plan presented.  The Court also found that while defendants' earlier actions may be subject to the deliberate indifference standard, the evidence indicated Les Galer did not have time to deliberate before shooting Mitchell, and therefore the higher intent to harm standard applies to that action.  The Court concluded that "there is no evidence to support a finding that defendant Les Galer pulled the trigger with any intent other than to protect himself or other police officers – a purpose clearly related to legitimate law enforcement objectives."  Summ. J. Order at 18.

The Court will not alter that conclusion.  With respect to the plan of entry, as described above, the Court finds that tactical entry was reasonable in light of the presence of the shotgun.  It was not deliberately indifferent to Mitchell's rights.  With respect to Galer's actions following the knock-and-announce, even if Mitchell had opened the door, Galer did not have time to deliberate before he entered the apartment; thus the higher "intent to harm" standard applies.  Under such urgent circumstances, "[o]nly a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience necessary for a due process violation." *County of Sacramento v. Lewis*, 523 U.S. 833, 834 (1998); *see also Wilkinson*, 610 F.3d at 554 ("For example, a purpose to harm might be found where an officer uses force to bully a suspect or get even.").  Les Galer's actions, even if unreasonable, were related to the legitimate object of search the apartment and

1    Mitchell. The decision to enter aggressively with gun pointed in the direction of movement does not

2    shock the conscience.

3            Summary judgment is therefore GRANTED to defendants on this claim.

4

5        **E.    Failure to Train and Failure to Supervise**

6            Plaintiffs bring two claims against defendant Wielsch only, for failure to train and failure to

7    supervise. TAC ¶¶ 50-55. Plaintiffs allege that Wielsch was deliberately indifferent to his duty to

8    adequately train CCCNET personnel, and deliberately indifferent to his duty to supervise the operation.

9    *Id.* Failure to train and failure to supervise claims, like all claims brought under Section 1983, require

10   a showing of a violation of a constitutional right. Because the Court initially found that defendants had

11   not violated any of Mitchell's constitutional rights, the Court granted summary judgment on these

12   claims as well. Having found a potential violation of Mitchell's Fourth Amendment rights, the Court

13   addresses the claims here.

14

15            **1.    Failure to Train**

16            A supervisor is liable under § 1983 for failing to train subordinates when the failure to train

17   amounts to deliberate indifference. *Canell v. Lightner*, 142 F.3d 1210, 1213 (9th Cir. 1998); *see also*

18   *Wereb v. Maui County*, 727 F. Supp. 2d 898, 919 (D. Haw. 2010). In order to prevail on a failure to

19   train claim, a plaintiff must establish that his constitutional injury would have been avoided had the

20   employees been properly trained. *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001).

21            Plaintiffs have provided no evidence that Wielsch was deliberately indifferent to the training of

22   the CCCNET team. In their response to defendants' initial motions for summary judgment, plaintiff

23   offered no opposition to Wielsch's arguments on either this or the failure to supervise claim. *See* Pls.'

24   Opp to Defs.' Mot. for Summ. J. (Dkt. 107). The only evidence the Court has with respect to the

25   training of the CCCNET team is Wielsch's declaration. Wielsch states that his role is limited to

26   ensuring that members assigned to CCCNET "have appropriate experience and training from their

27   employing agency before being assigned. Each new member undergoes training at Department of

28   Justice Advanced Training Center in Sacramento. The Field Training Officer observes and documents

United States District Court
For the Northern District of California

the performance of the new team member by completing a check-list of tasks . . ." Wielsch Decl. ¶ 9. Plaintiffs present no evidence or even questions of fact that Wielsch failed to comply with these requirements, or that any other failure to train led to a constitutional injury.

The Court therefore GRANTS Wielsch's motion for summary judgment on the failure to train claim.

### 2. Failure to Supervise

The failure to supervise claim likewise requires that plaintiffs establish that Wielsch was deliberately indifferent to Mitchell's constitutional rights. *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989); *see also Loomis v. City of Puyallup Police Dept.*, 2005 WL 1036445, *7 (W.D. Wash. May, 3, 2005). Unlike the "integral participation" analysis, supervisory liability requires establishing that the supervisor's own actions violated the Constitution. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Plaintiffs again provide no explicit opposition to Wielsch's separate motion for summary judgment on the failure to supervise claim. It is therefore unclear which actions plaintiffs argue constituted the failure to supervise. With respect to Wielsch's authorization of the operational plan involving tactical entry, the Court has already found that it was reasonable under the circumstances. In the Third Amended Complaint, plaintiffs do allege that Wielsch's failure to abort the mission once it was "compromised" amounted to deliberate indifference to Mitchell's safety. TAC ¶ 34. The only evidence plaintiffs provide that relate to this claim is their expert's statement that *Les Galer* should have realized the operation was compromised after the door did not immediately open, shouted "Compromise!" and withdrawn the team; however, the expert makes no mention of Wielsch. Clark Decl. ¶ 22. It is unclear that from Wielsch's perspective, the situation had been compromised by the one minute delay in the door opening. In any event, failure to withdraw the team does not evince deliberate indifference to Mitchell's safety on Wielsch's part.

Defendant Wielsch's motion for summary judgment on the failure to supervise claim is GRANTED.

United States District Court
For the Northern District of California

**F.        Wrongful Death**

Plaintiffs also bring a state law wrongful death claim against all defendants except Wielsch. California Code of Civil Procedure § 377.60(b) permits parents to bring a "cause of action for the death of a person caused by the wrongful act or neglect of another." "The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Center*, 140 Cal. App. 4th 1256, 1264 (2006). To prove the tort, plaintiffs must show that defendants violated their duty of care towards Mr. Mitchell, which was "the duty to use reasonable force under the totality of the circumstances." *See Brown v. Ransweiler*, 171 Cal. App 4th 516, 526 n. 10 (2009) (explaining that the same duty is owed to bystanders and suspects).

Defendants assert that they cannot be held liable under state law because the shooting was a justifiable homicide. "Under Penal Code section 196, a police officer who kills someone has committed a justifiable homicide if the homicide was necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 533 (2009) (internal quotation marks omitted). "The test for determining whether a homicide was justifiable under Penal Code section 196 is whether the circumstances reasonably create[d] a fear of death or serious bodily harm to the officer or to another." *Id.* (internal quotation marks omitted) (alteration in original).

Immunity exists for state law wrongful death claims as well. Section 820.2 of the California Government Code provides immunity to peace officers against state-law claims for their discretionary acts in arrest situations. *See Price v. County of San Diego*, 990 F.Supp. 1230, 1244 (S.D.Cal.1998); *Reynolds v. County of San Diego*, 858 F.Supp. 1064, 1074,75 (S.D.Cal.1994), *aff'd in part & rev'd in part on other grounds*, 84 F.3d 1162 (9th Cir.1996). However, Section 820.2 does not confer immunity if an officer uses unreasonable force. *See Price*, 990 F.Supp. at 1244; *Scruggs v. Haynes*, 252 Cal.App.2d 256, 266 (1967).

The Court also requests that the parties brief whether either Penal Code Section 196 or Cal. Gov. Code Section 820.2 applies in light of the Court's holding above.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART defendants' motions to reinstate summary judgment. The Court GRANTS summary judgment to defendant Wielsch on the failure to supervise and failure to train claims. The Court also GRANTS summary judgment to all defendants on the Fourteenth Amendment claim. The Court requests further briefing on qualified immunity for the Fourth Amendment claim and justified homicide/immunity for the state law wrongful death claim, as described *supra*. Defendants shall submit a brief on these issues by **August 23, 2012**. Plaintiffs then shall respond by **August 28, 2012**.

**IT IS SO ORDERED.**

Dated: August 13, 2011

_____
SUSAN ILLSTON
United States District Judge