**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY MITCHELL, SR., et al.<br><br>  Plaintiffs,<br><br> v.<br><br>CITY OF PITTSBURG, et al.,<br><br>  Defendants. | No. C 09-00794 SI<br><br>**ORDER DENYING DEFENDANTS' MOTION TO REINSTATE SUMMARY JUDGMENT** |

Currently before the Court is defendants' motion for reinstatement of the Court's January 26, 2011 Order Granting Defendants' Motions for Summary Judgment. On August 13, 2012, the Court granted defendants' instant motions, in part. However, the Court reserved judgment on reinstating summary judgment as to one of plaintiffs' claims – that the officers' method of entry violated the Fourth Amendment. The Court requested additional briefing on whether, assuming that the method of entry violated the Fourth Amendment, the officers were nevertheless entitled to qualified immunity under federal law, and similar immunity under California law. The parties have briefed the issues and the Court held a hearing on the matter on February 1, 2013.[1] Having considered the parties' arguments, the Court DENIES defendants' motion to reinstate summary judgment for the reasons discussed below.

---

[1] Both parties submitted additional declarations and evidence in connection with their briefs. The Court rejects these additional declarations and exhibits as outside the scope of the briefing the Court ordered in its August 13, 2012 Order. The additional material played no role in the Court's consideration of the issues presented here.

**BACKGROUND**

This suit arises out of the shooting death of decedent Timothy Mitchell, Jr., at the hands of police officer Les Galer on March 11, 2008. Officer Galer was employed by the City of Pittsburg, California, and was a member of the Contra Costa County Narcotics Enforcement Team ("CCCNET"). The shooting occurred while Galer and several other officers were executing a search warrant at Mitchell's apartment. The plaintiffs in this case are Timothy Mitchell, Sr. and Paulette Mitchell, the parents of Timothy Mitchell, Jr. The instant motion concerns plaintiffs' Fourth Amendment claim under 42 U.S.C. § 1983 against all defendants for violation of Timothy Mitchell, Jr.'s civil rights, because the manner in which they "execute[d] the search warrant was unreasonable and created a grave and unnecessary danger to Decedent and proximately caused Decedent's death." Third Amend. Compl. ("TAC") ¶¶ 41-42.[2]

On January 26, 2011, the Court granted the summary judgment for the five police officer defendants: Les Galer and his identical twin brother Phil Galer, Sean Dexter, Louis Lombardi, and Norman Wielsch. Judgment was entered against plaintiffs, and they appealed. However, while the appeal was pending in the Ninth Circuit, defendants Wielsch and Lombardi were arrested and indicted for corruption-related offenses, including the procurement and sale of marijuana and methamphetamines, theft, and the abuse of their authority as police officers during the execution of warrants. Following the indictments, the Court issued an Order in which it indicated that, on its own motion, it wished to order further briefing in this case. *See* Doc. 139 (citing Fed. R. Civ. P. 60(b); *Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*, 168 F.3d 347, 352 (9th Cir. 1999)). The Court requested that the United States Court of Appeals for the Ninth Circuit grant a limited remand to allow

---

[2] Plaintiffs' Fourth Amendment excessive force claims are tethered to a broader Fourteenth Amendment claim that, by violating the decedent's Fourth Amendment rights, plaintiffs have been deprived of their rights, as parents, to enjoy a familial relationship with their son. TAC ¶ 50-52. While generally, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted," *Alderman v. United States*, 394 U.S. 165, 174 (1969), "[i]n § 1983 actions, however, the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action," *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998); *see also Smith*, 818 F.2d at 1416–17 (finding, under California law, a Fourth Amendment claim under section 1983 survives the death of the plaintiff). Thus, any immunity holding with respect to plaintiffs' Fourth Amendment claim also applies to their Fourteenth Amendment familial relations claim.

the parties to brief, and the Court to consider, the following issue:

> Whether the criminal indictment of two of the defendants in this case has any impact on this case, such that plaintiffs should be relieved from the final judgment under Federal Rule of Civil Procedure 60(b).

The Ninth Circuit remanded the case to this Court to permit the Court to consider the described Rule 60 issue. Following briefing on the issue, the Court granted relief from final judgment on September 2, 2011, thereby vacating the January 26, 2011 Order Granting Defendants' Motions for Summary Judgment. Dkt. 195. On June 22, 2012, defendants filed the instant motions for reinstatement of the Court's January 26, 2011 Order.

## I. The August 13, 2012 Order

The August 13, 2012 Order Granting in Part Defendants' Motions for Reinstatement of Summary Judgment reevaluated the entirety of the Court's prior summary judgment findings and holdings in light of the indictments of defendants Wielsch and Lombardi, new discovery in the case, and other disputes of material fact. In particular, the Court reviewed each of the three separate Fourth Amendment excessive force violations plaintiffs asserted: (1) the decision to use a "tactical entry" at seven in the morning to search the apartment of a suspected marijuana dealer; (2) defendant Les Galer's decision to enter the apartment though the element of surprise had been lost by the more-than-a-minute delay in opening the screen door; and (3) defendant Les Galer's decision to shoot Mitchell.[3]

The Court reinstated summary judgment on the first of plaintiffs' purported excessive force violations. The Court found that the defendants' uncontroverted awareness of the presence of a shotgun in Mitchell's apartment "greatly amplified the risk of danger to the police and justified the plan to use

---

[3] In the August 13, 2012 Order the Court found that it need not address plaintiffs' third excessive force claim regarding the actual shooting, because even if Galer's pulling the trigger was reasonable at the moment he did so, he could still be held liable if the method of entry violated Mitchell's Fourth Amendment rights. *See Billington*, 292 F.3d at 1188 (*citing Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1366 (9th Cir. 1994) ("[I]f the police committed an independent Fourth Amendment violation by using unreasonable force to enter the house, then they could be held liable for shooting the man – even though they reasonably shot him at the moment of the shooting – because they used excessive force in creating the situation which caused [the man] to take the actions he did."). Thus, the entry and shooting excessive force claims are both linked to the immunity determination; if officer Galer is not entitled to immunity as to the entry, he is also not entitled to immunity for the shooting.

3

armed entry at seven in the morning." Dkt. 241 at 25. Although the now-indicted defendant Wielsch approved the tactical entry plan, there was no evidence that his decision to do so was improper or motivated by criminal intent. Accordingly, the Court found that the defendants' decision was reasonable and therefore constitutional.

With respect to plaintiffs' second excessive force claim, the Court found that it had improperly credited defendants' testimony regarding certain disputed facts about the method of entry. The January 26, 2011 Order, credited defendants' testimony and disregarded plaintiffs' expert's testimony in three key respects: (1) whether defendant Lombardi, and not Mitchell, opened both Mitchell's screen door and his apartment door; (2) whether defendants instructed Mitchell to "get down" as they entered the apartment; and (3) whether defendant Les Galer entered the apartment aggressively and with his gun pointed out in front of him.

Before discussing those disputed facts, the Court first recites the following undisputed facts. When the officers reached Mitchell's apartment, they arranged themselves outside of Mitchell's security screen door as follows: Dexter on the right side of the door, Lombardi mid-door, and Les Galer just to the left of the door. L. Galer Decl. (Dkt. 86) ¶ 20. The security door opened outward from the left side, with the hinges on the right. Five other officers, including defendant Phil Galer and defendant Wielsch, remained to the left of Les Galer. Marzan Decl. Ex. B 52:22-53:3. At approximately 7:00 a.m., Dexter made the knock and announce, pounding on the wall and yelling "Police; search warrant; come to your door." L. Galer Decl. ¶ 21; Dexter Decl. ¶ 23. He said this three or four times. L. Galer Dep. 54:22-25. Dexter testified that after the second announcement, he heard a male voice from inside the apartment say "Hang on." Dexter Decl. ¶ 22. Dexter repeated the announcement; after a short delay, Dexter heard the same male voice say, "You got the wrong place." Dexter Decl. ¶ 22. Les Galer also testified that he heard "a male voice inside the apartment yelling, 'You have the wrong house,' two or three times." L. Galer Decl. ¶ 22. Dexter then told Lombardi to open the door with the pick. Dexter Decl. ¶ 23. Lombardi attempted to open the outer security door, but had some difficultly. *Id*. ¶ 23. He finally got it open after 8 to 10 tries, taking a minute or more. *Id.* Once the security door was open, Les Galer noticed the front door to the apartment was open several inches. L. Galer Decl. ¶ 25. Les Galer did not know how the front door came to be open. *Id.* Galer made the decision to enter the premises. *Id*. ¶ 26.

4

From this moment forward, the parties' views of the facts diverge. Les Galer testified that he was kneeling at the doorjamb to the left of the door with the ram during the time when Lombardi attempted to open the security door and the front door became open. L. Galer Decl. ¶ 25. Once the front door became open, Galer "felt vulnerable in [his] position near the front door as [he] was not armed and because the suspect may have armed himself with a shotgun." *Id.* ¶ 26. Galer recounted:

> Based on my training and experience, I made the decision to enter the premises first. I wanted to get out of the 'fatal funnel' once I saw that the front door was ajar, so as to get all of the officers into the room safely and serve the search warrant . . .
>
> I immediately dropped the ram and removed my service revolver from its holster with my right hand. I pushed the door open with my left hand. The door opened inward to the east (to the right). I then made tactical entry into the room aggressively, in a controlled, smooth and deliberate fashion, based upon my training and experience. Upon entry, I moved in a western direction to the left, the result of which would have been to draw the attention of the subject to myself and away from other officers following through the door. Although it was fairly dark inside, I could see the silhouette of an African-American male standing towards the middle or rear of the living room.
>
> . . .
>
> As I moved through the apartment, I saw the subject moving towards me. We were coming towards each other. I had my firearm in my right hand out in front of me pointed in the direction I was moving. I suddenly felt the subject grab a hold of my right hand/wrist. I felt a sense of immense urgency to retain my pistol and gain some distance between myself and the subject. I extended my left hand towards the subject's right shoulder. Simultaneously, I pulled my firearm in my right hand back and upwards towards my right shoulder in a position of retention with the muzzle of my gun pointed in a downward angle towards the subject's body.
>
> As I pulled my right hand back, the subject continued to hold onto my right hand/wrist. Fearing that I was losing control, I discharged the firearm.

L. Galer Decl. ¶¶ 27-32.

Plaintiffs' expert, Clark, asserted that Galer's recounting was inconsistent with the evidence. In Clark's view, Mitchell had actually complied with the police order to open the door:

> Physical evidence demonstrates that [Mitchell] had opened both the outer security screen door and the inner front door and neither of the doors was forcibly breached by Officer Lombardi. This is proven [by] the fact that the doors do not show any visible signs of damage consistent with being forced open with a "pick" (pry tool used by police to open security doors). The photographs taken by the police technician on the date of the incident show no signs of damage to the frame of the outer security door. The only visible damage to the screen door consists in [sic] a number of holes in the screen and a bent support rod on the front of the door. This minor damage is consistent with Officer

5

> Lombardi's use of the pick in an attempt to force the door open. However, if the door had been forced open, we would expect to see that the door frame had been severely damaged and it is not. The door frame is clearly undamaged. Nor is there any visible damage to the inner front door. If Lombardi had forced the inner door open which [sic] pick, then there would undoubtedly been visible damage to the front door. There is none. Also, the plaintiffs have testified that they examined the doors when they visited the apartment the day after the shooting and that both doors worked perfectly. They opened, closed and locked. The lack of damage to either door, the lack of damage to the door frame, and the location of the body on the floor a couple of feet inside the doorway proves that Mr. Mitchell had opened the doors from within in compliance with the police orders and that neither door was forcibly breached by the police. Officer Lombardi's testimony that he forced the outer door open is false.

Clark Decl. ¶ 17 (Dkt. 107). Consistent with Clark's statements, photos of the outer security door show punctures in the mesh screen, but no damage to the exterior frame. Yourke Decl., Ex. 5 (Photos). The door has both a deadbolt and a doorknob locking mechanism; neither appeared damaged. *Id*. The police post-incident report contained similar findings, "some damage to the framework of the metal security door consisting of both apparent impact and pry marks, which appear to be fresh," but only as to the front of the door, not the exterior frame or the doorknob or locking mechanism. *Id*., Ex. 6.

Clark also contended that defendant Les Galer failed to warn Mitchell upon making entry into the apartment, in violation of standard police policies and procedures. Clark Decl. ¶ 19. Les Galer testified, "I do not have a recollection of saying anything to the subject as I entered the room. Based on all of my training and experience, however, I would have given commands for the subject to show his hands and hit the ground. That was, and is, my custom and practice." L. Galer Decl. ¶ 30.

### 1. **Evaluation of Disputed and Undisputed Facts**

In the August 13, 2011 Order, the Court found that its prior Summary Judgment Order improperly discounted the testimony of plaintiff's expert, Clark, who disputed each of the key facts. Given the new credibility issues raised by Lombardi's indictment in particular, the August 13, 2012 Order instead held that there was a genuine issue of material fact as to whether Mitchell opened the door. If Mitchell opened the door, the Court found, it called into question the reasonableness of defendant Galer's actions in raising his firearm and entering the room aggressively with his gun drawn in front of him, without instructing Mitchell to "get down," as plaintiffs' expert Clark had testified. The Court reiterated that summary judgment is inappropriate where credibility is at issue and found that

6

whether the door was opened by Mitchell or Lombardi is an issue of fact that turns on the defendants' and Clark's credibility.

### 2. Fourth Amendment Violation

The U.S. Supreme Court has said, "the method of an officer's entry into a dwelling [is] among the factors to be considered in assessing the reasonableness of a search or seizure." *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995). This is so even where the police have obtained a valid search warrant. *Id.* at 929. The police must "strike [] the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by" the execution. *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). Excessive force claims, in particular, are analyzed under the Fourth Amendment's objective reasonableness standard as articulated in *Graham v. Connor*, 490 U.S. 386, 399 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985). Determining whether the force used was reasonable requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham*, 490 U.S. at 396. The test of reasonableness requires a careful attention to the facts and circumstances of each particular case, including: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396.

Applying this standard, assuming plaintiffs' alleged version of the facts, the Court held that Les Galer's "actions would constitute a violation of Mitchell's rights against unreasonable seizure." Dkt. 241 at 29. But that did not end the Court's summary judgment inquiry. In the initial summary judgment briefing, defendants argued that they were entitled to qualified immunity even if their behavior violated the Fourth Amendment. Because the Court did not reach this question in the initial January 26, 2011 Summary Judgment Order, the parties did not brief the issue of qualified immunity in the motions to reinstate summary judgment. Nor did the original summary judgment motions focus on qualified immunity with respect to the precise constitutional violation at issue.

The Court requested additional briefing on the question of whether, taking plaintiffs version of the facts as true, defendant Les Galer violated Mitchell's clearly established constitutional rights. *See*

7

*LaLonde v. County of Riverside*, 204 F.3d 947, n. 10 (9th Cir. 2000) (reversing district court's grant of summary judgment because it "should have determined whether the officers were entitled to qualified immunity as a matter of law on the basis of undisputed facts and, where material facts were disputed, on the plaintiff's version of events."). In particular, the Court asked the parties whether it has been clearly established that an officer's aggressive home entry with his gun pointed out in front of him, without telling the resident to get down or otherwise move, when the resident has complied with an officer's request to open the door, is unconstitutional.

## LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id*. at 324 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.*

However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)(2).

**DISCUSSION**

**I. Qualified Immunity as to plaintiffs' excessive force claims.**

Although the Court's August 13, 2012 Order held that there were disputed issues of material fact with respect to plaintiffs' method-of-entry/excessive force claim, summary judgment may still be appropriate if defendants, all police officers, are entitled to qualified immunity. The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) (*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Court has already found that taking all of plaintiffs' allegations as true, Les Galer violated Mitchell's constitutional rights against unreasonable seizure. *See* Dkt. 241 at 29 ("Taking the facts in a light most favorable to the plaintiffs, these actions would constitute a violation of Mitchell's rights against unreasonable seizure."). In defendants' briefing and at the February 1, 2013 hearing, defendants argued that the Court improperly weighed the facts in plaintiffs' favor in arriving at the conclusion that a constitutional violation had been established. In fact, defendants devote nearly all of their responsive brief to attacking the veracity and credibility of plaintiffs' expert – rather than instructing the Court on the relevant law, as requested. *See* Dkt. 250 (Brief of Def's. Dexter, Galer, Galer, and Lombardi). The Court will not disturb this prior holding, particularly in light of the Ninth Circuit's recent reminder that on summary judgment, "[w]e construe the facts, overwhelming or otherwise, in [plaintiff's] favor and ask whether the district court properly denied [the officer] immunity on the basis of those facts." *Johnson v. Bay Area Rapid Transit Dist.*, 2013 WL 3888840, at * 7 (9th Cir. July 30, 2013).

The Court therefore proceeds to the second step of the analysis, to determine whether the actions alleged violate a *clearly established* constitutional right. *Wilkins*, 350 F.3d at 954. "Clearly established means that it would be clear to a reasonable officer that his conduct was unlawful in the situation he created." *Id.* In other words, "for a constitutional right to be clearly established, its contours must be

9

1 sufficiently clear that a reasonable official would understand that what he is doing violates that right." 2 *Boyd v. Benton County*, 374 F.3d 773, 780-81 (9th Cir. 2004) (*citing Hope v. Pelzer*, 536 U.S. 730, 739 3 (2002)). The reasonable officer avoids committing not only those acts that have been clearly established 4 as unconstitutional, but also similar acts even where there is no case specifically addressing them, so 5 long as existing law provides fair warning that those acts, too, are unconstitutional. *See Hope v. Pelzer*, 6 536 U.S. 730, 739-43 (2002); *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011).

The Court begins this inquiry with binding precedent. *Boyd,* 374 F.3d at 781. However, even if there is no binding precedent on the question, a court can consider whatever decisional law is available, including the decisions of state courts, other circuit courts, district courts and even unpublished district court decisions. *Drummond ex. rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003). In excessive force cases, such as this one, the relevant inquiry is whether, "under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and whether any mistake to the contrary would have been reasonable." *Boyd*, 374 F.3d at 781. Qualified immunity is an affirmative defense and therefore the burden of proof is on the public official asserting immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1981).

### A. Aggressive entry

Plaintiffs argue that relevant case law clearly establishes that a police officer may not point a gun at a citizen who is unarmed and not resisting or attempting to flee. Defendants argue that these cases show that it is clearly established that where there are objective factors supporting a potential hazard to police officers or others, officers are constitutionally entitled to exercise reasonable force, including aggressive and armed entry into a residence.[4] Neither position adequately captures the standard courts have applied. Potential hazard to the officer is not dispositive, as defendants suggest. Nor does the availability of immunity turn only on whether the suspect is armed, resisting, or fleeing, as plaintiffs

---

[4] The parties also cite to *Anderson v. City of Bainbridge Island*, 2010 WL 4723721 (W.D. Wash. 2010) and *Hartmann v. Hanson*, No. C-09-03227 WHA, 2010 WL 335677 (N.D. Cal. 2010). However, the warrant execution and police shooting of Mitchell here occurred in 2008, two years prior to these cases. Thus, only cases prior to 2008 are relevant to show what Fourth Amendment standard governed Les Galer's entry. *See Saucier v. Katz*, 533 U.S. 194, 207 (2001) ("Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred.").

10

1 suggest. Instead, a review of relevant case law shows that courts apply a sliding scale, where the amount of police officer aggressiveness permitted by the Fourth Amendment varies based on how compliant a suspect is – evidenced by the attendant circumstances such as whether the suspect is armed, resisting, or fleeing. It is to those cases the Court now turns.

Defendant Wielsch's brief (Dkt. 249) draws the Court's attention to the only U.S. Supreme Court case cited by any party involving an excessive force claim where the officers entered the plaintiff's home aggressively, with guns drawn. In *Muehler v. Mena*, 544 U.S. 93 (2005), the Court held that the authorization to use reasonable force is inherent in the authorization to detain subjects while executing a warrant. While the force at issue was the use of handcuffs on a mere occupant of the premises – not a suspect, or defendant – the underlying facts of the officers' entry and the Court's reasoning are instructive. In *Mena*, SWAT team officers executed a warrant, at 7 a.m., in search of a male suspect thought to be involved in a drive-by shooting. The plaintiff "was asleep in her bed when the SWAT team, clad in helmets and black vests, entered her bedroom and placed her in handcuffs at gunpoint." *Id.* at 96. According to the Ninth Circuit decision below, the plaintiff "opened her eyes to find a person dressed in black pointing a gun with a light on top in her face." *Mena v. City of Simi Valley*, 332 F.3d 1255, 1262 (9th Cir. 2003). It was not "until an officer pushed [the plaintiff] onto her bed, face down, and placed handcuffs on her [that] she was able to *infer* that these were police officers." *Id*. Although the Supreme Court focused not on the aggressiveness of the SWAT team entry, but rather on the aggressiveness of the detention in handcuffs, the Court noted that "the governmental interests…are at their maximum when…a warrant authorizes a search for weapons and a wanted gang member resides on the premises." *Mena*, 544 U.S. at 100. In such "inherently dangerous situations," aggressive detention strategies are necessary to minimize the risk of harm to officers and others. *Id.*

While *Mena* is instructive as to the relationship between aggressiveness and danger where executing a warrant, it is not controlling because the Court did not address the issue of compliant subjects. Not only did Les Galer enter Mitchell's residence aggressively with his gun drawn while executing a warrant, but – taking the facts in the light most favorable to the non-moving parties – he did so without issuing a warning Mitchell to get down and despite Mitchell's compliance in just having opened the door moments before the entry.

11

In *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002), the Ninth Circuit dealt directly with the aggressiveness permitted in light of a subject's compliance. There the police were called to investigate the shooting of a dog. Plaintiff, a 64-year-old ex-police officer, shot his neighbor's dog after the dog attacked his chickens. When the now-unarmed plaintiff approached police, the police drew their guns at close range and pointed them at plaintiff's head. The Ninth Circuit held that the officers' use of force violated the Fourth Amendment because it was not tailored to the compliance and lack of threat posed by the unarmed subject. In finding the officers' behavior unreasonable, the Court noted that "[t]he crime under investigation was at most a misdemeanor; the suspect was apparently unarmed and approaching the officers in a peaceful way…[t]here were no dangerous or exigent circumstances apparent at the time of the detention, and the officers outnumbered the plaintiff." *Id.* at 1014. The "only circumstance[] …favoring the use of force was the fact that plaintiff had earlier been armed with a shotgun that he used to shoot the neighbor's dogs." *Id*. But the Ninth Circuit concluded that plaintiff's earlier use of a weapon, which he clearly no longer carried, was insufficient to justify the officers' intrusion on plaintiff's personal security. *Id.*

Similarly, in *Motley v. Parks*, 432 F.3d 1072 (9th Cir. 2005), overruled on other rounds in *United States v. King*, 687 F.3d 1189 (9th Cir. 2012), the Ninth Circuit discussed the aggressiveness permitted based on the compliance or danger presented by the subject. There, an officer kept a gun trained on a 5-month old infant while searching the infant's bedroom during a sweep of the house of a parolee's girlfriend. The Ninth Circuit held that, "[w]hile it may have been reasonable for [the officer] to have drawn his firearm during the initial sweep of a known gang member's house, his keeping the weapon trained on the infant" violates the Fourth Amendment. *Id.* at 1089. The Court reasoned that none of the usual factors justifying aggressiveness, such as danger to the officers, was present; the subject infant was neither a suspect nor attempting to evade the officers or posing any other threat. *Id*.

In *Baldwin v. Placer County*, 418 F.3d 966 (9th Cir. 2005), the Ninth Circuit again considered whether officers' aggressiveness was justified given the compliance and threat level posed by a suspect. There a group of five officers executing a search warrant for marijuana entered plaintiff's home "para-military style" without knocking. *Id.* at 969. Upon encountering the plaintiff, an officer pointed his gun at plaintiff, ordered him to lie down, and while plaintiff complied, the officer held his gun to the rear

12

1  of plaintiff's head with his knee in the small of plaintiff's back. *Id.* Considering factors similar to *Robinson* and *Motley*, which also involved the aggressive wielding of guns, the Ninth Circuit noted that "whatever exigency existed was insufficient to justify" the officers' conduct. *Id*. at 970. In particular, the Court observed that the plaintiff was a dentist, and nothing in the record indicated that the officers had reason to believe that he would resist or flee. *Id.* Also, the officers had stated no belief that the plaintiff would be armed; had mentioned no criminal history or conspiracy that could have justified such a belief; and had provided no reason not to identify themselves before giving orders to the plaintiff. *Id.* Accordingly, the Court found that the officers could not justify the force used based on the compliance or threat level presented. *Id.*

While *Robinson*, *Motley*, and *Baldwin* involved Fourth Amendment intrusions with compliant or non-threatening plaintiffs, the parties also cite to *Johnson v. City of Bellevue*, 2006 WL 223797 (W.D. Wash. 2006), which involved an excessive force claim from a semi-compliant plaintiff. Officers responded to plaintiff's home in the belief that plaintiff was in danger of harming himself. Plaintiff had called a union representative and told her that he was "sad and anxious" about an upcoming job-related hearing. *Id.*, at *1. She became nervous and called police, asking them to do a "wellness check" at plaintiff's home. *Id*. After unsuccessfully attempting to phone the plaintiff, four police officers charged into his home, all with their guns drawn and trained on him. *Id.* One officer yelled at him to get up against the wall, while another officer approached him, patted him down and handcuffed his wrists together behind his back. *Id*. Plaintiff argued that the officers used excessive force when they entered his apartment with their weapons drawn and kept their weapons pointed at him until well after it was clear he posed no threat to the officers. The Court disagreed, and noted that plaintiff admitted that he repeatedly paused before complying with the various orders from the officers. Thus, with "misapprehension of Plaintiff's circumstances, it was reasonable for [the officers] to suppose that Plaintiff's pauses before complying with their requests were due to resistance on his part, rather than fear." *Id.*, at *4. Given the officers' belief that plaintiff might react unpredictably or dangerously, since he was allegedly in the midst of a suicide attempt, and given plaintiff's delays in complying with orders, the Court found that the officers' actions were justified by the exigency of the non-compliant circumstances presented. *Id.*, at *5.

13

*Robinson*, *Motley*, *Baldwin* and *Johnson* all bear important similarities to the circumstances that confronted the officers executing the warrant at Mitchell's residence on March 11, 2008. Notably, all four cases confirm that Les Galer's aggressive entry of Mitchell's residence, with his gun drawn in front of him, may have been justified by Mitchell's compliance level. In terms of their reasonable perception of threat level posed by Mitchell, the officers believed that Mitchell had a gun in his home, which they believed to be right next to the front door; that he was suspected of criminal wrongdoing, including dealing drugs out of his home; and – erroneously – that he had been convicted of robbery. Also, officers were executing a valid search warrant, an "inherently dangerous situation," according to *Mena*. *Mena*, 544 U.S. at 100. In terms of compliance, while plaintiffs allege that Mitchell ultimately opened the door to allow the officers to enter, his compliance prior to that time was certainly more dubious that the pauses and delays of the emotionally unstable and potentially suicidal plaintiff in *Johnson*. Mitchell initially told the officers they had the wrong residence and only opened the door after several knocks and exchanges. From defendant Les Galer's perspective, Mitchell was not nearly as compliant or non-threatening as the plaintiff's in *Robinson* and *Baldwin*, where both plaintiffs obeyed police orders immediately. In any event, Mitchell was at least as non-complaint as the plaintiff in *Johnson*, where the Ninth Circuit found the officers' aggressiveness to be justified. Thus, given the relevant cases, the Court cannot say that Officer Les Galer's entry, with his gun drawn, into Mitchell's home was objectively unreasonable.

### B. Failure to Warn Mitchell to "Get Down!"

The U.S. Supreme Court has said that in some circumstances, officers may use deadly force "if necessary to prevent escape, and if, *where feasible*, *some warning has been given*." *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985) (emphasis added). Where serious force is contemplated, the Ninth Circuit similarly has held that warnings should be given by an officer, when feasible, if use of force in effecting seizure may result in serious injury. *See Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001).

While there is no allegation that Les Galer entered Mitchell's home intending to use deadly force, the circumstances – taking the facts in the light most favorable to the non-moving parties – show that Galer could be certain that his method of entry would lead to a serious or fatal interaction. As

14

discussed, there is a significant factual dispute about the officers' entry: the officers claim to have forced open the front door while plaintiffs' expert contends that Mitchell himself opened the door. The only available evidence showed no signs that the officers had in fact forced the door open, and thus plaintiffs' expert asserted that the officers' version of the story was false. Assuming Mitchell had just opened the door moments before Galer charged in, plaintiffs contend that Officer Galer should have known Mitchell was standing just inside the door and that Galer would confront or collide with Mitchell immediately upon charging into the home. Given this awareness, the reasonable officer would know that he was required to offer a warning in conjunction with engineering such a potentially fatal interaction. Upon reviewing relevant case law, the Court agrees with plaintiffs.

In the leading Ninth Circuit case on failure to warn claims, *Deorle v. Rutherford*, an officer shot the subject in the eye with bean-bag ammunition without any warning, causing his eye to be removed. 272 F.3d at 1278. Plaintiff's wife had earlier called the police when plaintiff became erratic after consuming a half-pint of vodka and prescription drugs upon learning that he was infected with Hepatitis C. *Id.* at 1276. Officers arrived at plaintiff's home not to arrest him, but to investigate the reportedly erratic behavior. *Id.* at 1280. Over the next forty minutes, numerous officers surrounded plaintiff as he roamed the sidewalk and front of his property. While the plaintiff was verbally abusive to the officers gathered, he was physically compliant with their orders. He complied with officer demands to drop potentially threatening items, including an unloaded crossbow and a hatchet. *Id.* at 1276-77. Nevertheless, one officer lodged himself in a secure location against a tree and shot plaintiff as the plaintiff walked toward him, unarmed. *Id.* at 1281. The officer testified that he shot plaintiff to prevent the plaintiff from getting too close to him, other officers and the public. *Id.* Considering the totality of the circumstances, the Ninth Circuit held, "[t]he absence of a warning or an order to halt is also a factor that influences our decision. Shooting a person who is making a disturbance because he walks in the direction of [the officer]…is clearly not objectively reasonable. Certainly it is not objectively reasonable to do so when the officer neither orders the individual to stop…and does not even warn him that he will be fired upon if he fails to halt." *Id.* at 1283-84.

To be sure, Mitchell's case is distinguishable in that Les Galer's interaction with Mitchell lasted a few short minutes, whereas the officer in *Deorle* had sufficient time to observe the plaintiff and

15

ascertain his compliance level. Nonetheless, *Deorle* instructs that a warning prior to the use of potentially serious force is reasonable where it is feasible. Officer Les Galer admitted that he is trained to give warnings and that the appropriate thing to do in this particular situation was to give a warning. *See, e.g.*, L. Galer Decl. ¶ 30 ("Based on all of my training and experience, however, I would have given commands for the subject to show his hands and hit the ground. That was, and is, my custom and practice."). Thus, Les Galer actually admitted that he was aware of crux of *Deorle*'s holding, that warnings are appropriate where feasible. Moreover, defendants, who carry the burden on the qualified immunity affirmative defense, do not allege that such a warning was not feasible. Les Galer's testimony was that "I do not have a recollection of saying anything to the subject as I entered the room." L. Galer Decl. ¶ 30. To the extent defendants allege that such a warning was not feasible, or even that it was in fact given, those factual disputes are appropriate for a jury, not for the Court on summary judgment.

Moreover, case law subsequent to *Deorle* has consistently confirmed its essential holding. *See, e.g., Jackson v. City of Bremerton*, 268 F.3d 646, 652-53 (9th Cir. 2001) (finding that the officer's "safety interest" "increased further when the group was warned by police that a chemical irritant would be used if they did not move back ... and the group refused to comply."); *Boyd v. Benton Cnty.*, 374 F.3d 773, 779 (9th Cir. 2004) (finding excessive force and a violation of clearly established law where officers threw a "flash-bang device" into a crowed room – without warning – even though they had reason to believe one occupant was armed); *Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1119 (9th Cir. 2005) (even where the suspect did not actually hear the warnings because he was wearing headphones, officers entitled to immunity for shooting suspect who failed to heed numerous warnings to stop and drop a sword that he was carrying into a home in a residential area); *Casey v. City of Federal Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) (finding excessive force and a violation of clearly established law, reasoning that "[t]he absence of any warning" before the officer deployed her taser ... "makes the circumstances of this case especially troubling."). Given the precedent since *Deorle*, and in light of Galer's own testimony that he was trained to give commands "for the subject to show his hands and hit the ground," it is clear that Les Galer had fair warning that his alleged conduct was unconstitutional.

The qualified immunity standard provides ample room for mistaken judgments with respect to

16

1 established law. *Hunter v. Bryant*, 501 U.S. at 229. The Supreme Court has said that any excessive
2 force analysis "must embody allowance for the fact that police officers are often forced to make split-
3 second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the nature
4 of the force that is necessary in a party situation." *Graham*, 490 U.S. at 396-97. "The resolution of
5 immunity questions," like those here, "inherently requires a balance between the evils inevitable in any
6 available alternative." *Harlow v. Fitzgerald*, 457 U.S. 800, 813 (1982). On the one hand, culpable
7 officials should not receive blanket immunity from liability; on the other, officials who make reasonable
8 mistakes while trying to do their jobs should not bear the costs of litigation – nor should the taxpayers
9 underwriting the officials' defense. *Id*. at 814. "Our society vests law enforcement officers with the
10 authority to carry and use weapons and tactics that may injure, sometimes fatally, people they suspect
11 of committing crimes. Officers are given a degree of responsibility concomitant with that grave
12 authority, with the expectation that they will exercise it discerningly." *Johnson*, 2013 WL 3888840, at
13 \*17. Accordingly, courts should not substitute their judgment for the officers' own in evaluating the
14 officers' reactions to novel and dangerous situations. "But none of that means we abandon our
15 expectation that the police will discharge their duties professionally and responsibly." *Id*.

16 That these were split-second decisions would not excuse Les Galer's knowing disregard for
17 clearly established standards. Although Galer's decision to enter Mitchell's residence aggressively with
18 his gun drawn may be reasonable based on the circumstances, his decision to withhold a warning where
19 it was otherwise feasible, if he made such a decision, would be contrary to established law, and
20 admittedly, his own training. The Court recognizes that a jury may find no constitutional infirmity after
21 viewing these disputed facts and considering them alongside the credibility of the relevant witnesses.
22 A jury may find, for example, that it was not feasible for Galer to issue a warning, or even that he did
23 give such a warning. It may also conclude that Mitchell did not open the door for the officers, and
24 therefore that Galer had no reason to think that Mitchell would be standing just inside the door and that
25 Galer's aggressive entry, gun drawn, would lead to a fatal collision. However, viewing facts most
26 favorable to the plaintiff – as the Court must now do – the Court finds that Officer Les Galer, as well
27 as officers Phil Galer, Dexter, Lombardi and Wielsch, are not entitled to immunity with respect to
28

17

plaintiffs' method of entry excessive force claim.[5] Their liability for Mitchell's death turns on disputed issues of material fact best resolved by a jury.

**II.     Immunity for Wrongful Death Claim under California Law.**

Plaintiffs also bring a state law wrongful death claim against all defendants except Wielsch. California Code of Civil Procedure § 377.60(b) permits parents to bring a "cause of action for the death of a person caused by the wrongful act or neglect of another." "The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Center*, 140 Cal. App. 4th 1256, 1264 (2006). To prove the tort, plaintiffs must show that defendants violated their duty of care towards Mitchell, which was "the duty to use reasonable force under the totality of the circumstances." *See Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526 n. 10 (2009) (explaining that the same duty is owed to bystanders and suspects).

Defendants assert that they cannot be held liable under state law because the shooting was a justifiable homicide. "Under Penal Code section 196, a police officer who kills someone has committed a justifiable homicide if the homicide was necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 533 (2009) (internal quotation marks omitted). "The test for determining whether a homicide was justifiable under Penal Code section 196 is whether the circumstances reasonably create[d] a fear of death or serious bodily harm to the officer or to another." *Id*. (internal quotation marks omitted) (alteration in original).

Immunity exists for state law wrongful death claims as well. Section 820.2 of the California Government Code provides immunity to peace officers against state-law claims for their discretionary acts in arrest situations. *See Price v. County of San Diego*, 990 F.Supp. 1230, 1244 (S.D. Cal. 1998); *Reynolds v. County of San Diego*, 858 F.Supp. 1064, 1074-75 (S.D. Cal. 1994), *aff'd in part & rev'd* in part on other grounds, 84 F.3d 1162 (9th Cir. 1996). However, Section 820.2 does not confer

---

[5] The August 13, 2012 Order held that Phil Galer, Dexter, Lombardi and Wielsch were "integral participants" in the alleged constitutional violation. Thus, they similarly do not enjoy immunity if Les Galer does not enjoy immunity.

immunity if an officer uses unreasonable force. *See Price*, 990 F.Supp. at 1244; *Scruggs v. Haynes*, 252 Cal.App.2d 256, 266 (1967).

The Court's August 13, 2012 Order also requested that the parties brief whether either Penal Code Section 196 or Cal. Gov. Code Section 820.2 applies to plaintiffs' wrongful death claim. Given the disputed facts here and the parties' positions, the Court is convinced that neither provision prohibits plaintiffs' wrongful death claim from going forward.

As stated above, Cal. Gov. Code Section 820.2 does not apply where an officer uses unreasonable force. Defendants argue that Les Galer acted in self-defense and that therefore, his actions were reasonable. However, the entire premise of the Court's summary judgment inquiry here is that plaintiffs have adequately stated a constitutional violation involving *excessive* force in at least the method of entry. And as the Ninth Circuit has explained, "if the police committed an independent Fourth Amendment violation by using unreasonable force to enter the house, then they could be held liable for shooting the man – even though they reasonably shot him at the moment of the shooting – because they used excessive force in creating the situation which caused [the man] to take the actions he did." *Billington*, 292 F.3d at 1188 (*citing Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1366 (9th Cir. 1994)). Thus, assuming the truth of plaintiffs' version of the facts, as the Court must at summary judgment, defendants are not entitled to immunity under Section 820.2.

Immunity under California Penal Code Section 196 is similarly unavailable. While there can no be no civil liability for a justifiable homicide, an officer cannot create the peril complained of only to assert defense of self and others. As plaintiffs note, it is well-established that "one who negligently creates a situation threatening harm to another person may be liable for injury to that person…resulting from the threatened party's efforts to avoid the peril." *Sparks v. City of Compton*, 64 Cal.App.3d 592 (1976). Here, again, assuming facts most favorably toward plaintiffs, Les Galer created the peril by using excessive force in entering Mitchell's apartment. Thus, Les Galer invited the peril – the deadly collision that occurred as he charged into the residence without warning Mitchell to get out of the way of his pointed gun, shortly after Mitchell opened the door, ensuring that Mitchell would likely be near the door and thus, in the path of Les Galer's pointed gun.

**CONCLUSION**

Because defendants are not entitled to immunity under federal or state law, the Court DENIES defendants' motion for reinstatement of summary judgment on plaintiffs' method of entry excessive force claim. The Court also DENIES defendants' motion for summary judgment as to immunity under California law from plaintiffs' wrongful death claim.

The parties are further ordered to appear at a Case Management Conference on **November 8, 2013 at 3:00 p.m.** The parties are directed to submit a joint statement no later than seven days prior to the Conference pursuant to Civil Local Rule 16-10(d).

**IT IS SO ORDERED.**

Dated: October 1, 2013

SUSAN ILLSTON
United States District Judge